**Terry SCHULZE, Plaintiff,**

v.

**MERITOR AUTOMOTIVE, Defendant.**

**No. 1:99CV4–C.**

United States District Court,
W.D. North Carolina,
Asheville Division.

May 30, 2000.

Geraldine Sumter, Ferguson, Stein, Wallas, Gresham & Sumter, P.A., Charlotte, NC, for Terry Schulze.

Boyd B. Massagee, Jr., Prince, Youngblood, Massagee & Jackson, Hendersonville, NC, for Steve Wells.

Margaret H. Campbell, Ogletree, Deakins, Nash, Smoak & Stewart, Atlanta, GA, A. Bruce Clarke, Ogletree, Deakins, Nash, Smoak and Stewart, Raleigh, NC, for Meritor Automotive.

## MEMORANDUM OF DECISION

COGBURN, United States Magistrate Judge.

**THIS MATTER** is before the court upon defendant's Motion for Summary Judgment in accordance with 28, United States Code, Section 636(c). Having considered the well-reasoned briefs and oral arguments of respective counsel, the court will grant defendant's Motion for Summary Judgment for the reasons discussed below, and a judgment reflecting such decision will be filed simultaneously herewith.

## I. Factual Background

The following facts, viewed in a light most favorable to plaintiff, are not disputed for purposes of the pending motion. The parties, however, disagree as to whether such facts would support a trial on the claims asserted.

In her amended complaint, plaintiff alleges that defendant violated Title VII of the Civil Rights Act of 1964 and North Carolina statutory and common law. Each claim stems from alleged sexual harassment of plaintiff by Stephen Wells, who is not a party to this action, but who at all relevant times was the plant manager of defendant's factory located in Fletcher, North Carolina.

Plaintiff began her career with defendant's predecessor, Rockwell International, on October 10, 1983, as a data entry clerk. She bid for and received a promotion as payroll control clerk in 1991. Her immediate supervisor was Bill Carter, accounting manager, who reported to Larry Burgin, plant controller, who, in turn, reported to Wells. Plaintiff had little daily interaction with Carter or Burgin, but had good working relationships with both. Wells was plant manager until May 1, 1996, when he was forced to resign.

In 1995, Rockwell eliminated one of the two payroll positions and restructured the remaining position. Burgin and Carter offered the resulting position of payroll analyst to plaintiff without posting it for competitive bidding. Plaintiff accepted the offer and received a raise of two grade levels, with no resulting change in the chain of command discussed above.

In 1995, the payroll office where plaintiff worked was used by Burgin, Carter, and Shirley Waldrop, an accounts-payable clerk whom plaintiff trained to be her back-up in payroll. Plaintiff had a say in Waldrop's selection and, at first, had a good working relationship with her.

It is not disputed that during her career with defendant, plaintiff developed interpersonal problems with some coworkers, including Waldrop. She received regular evaluations and pay raises, including very favorable evaluations from Carter and Burgin while she worked in payroll between 1991 and 1999, which she considered fair. Plaintiff continued to work in payroll until May 3, 1999, when she resigned.

It is beyond dispute that defendant and its predecessor maintained policies regarding ethics, equal employment opportunity, sexual harassment, and open doors. During orientation, and periodically throughout their employment, employees were trained on sexual harassment, business ethics, standards of conduct, and equal employment opportunities. In addition, they were reminded annually that they had multiple avenues for reporting workplace concerns, including making reports through their chain of command (*see* above), to the Human Resources Department, and to the corporate ombudsman. The policies were distributed in employee handbooks, including plaintiff's, further disseminated through ethics and sexual-harassment publications, and posted on bulletin boards. Defendant and its predecessor instructed their employees to comply with these policies and to report any concerns about deviations from policy. As discussed below, plaintiff was not only well acquainted with the existence of the policies, but had firsthand knowledge of the inner workings and effectiveness of those policies through participation in policy-violation investigations.

There is a dispute as to whether plaintiff and Wells developed a sexual relationship while both were employed by defendant. Plaintiff claims that her relationship with Wells was a friendship that never de-

veloped into a sexual relationship; Wells disputes that there was no affair. That dispute, while genuine, is not material to resolution of the pending motion.

It is undisputed that the relationship between Wells and plaintiff appeared friendly and consensual to the managers who observed them. It is also undisputed, however, that the Schulze/Wells relationship prompted several corporate ombudsman investigations over the course of two and one-half years, beginning in 1994.

In June 1994, two employees alleged that plaintiff was falsifying her time cards and that she and Wells were having an affair. Randy Springer, who was then plant human resources director, and Greg Brown, manager of employer relations and human resources at corporate headquarters in Troy, Michigan, investigated. Brown interviewed plaintiff, who said that she and Wells were friends and that they were not having an affair. Plaintiff admitted that she gave Wells a gift to thank him for his assistance, for which she had asked, in getting her the position of payroll control clerk. The first investigation concluded that plaintiff had not falsified her time and that there was, as plaintiff stated, no sexual affair between her and Wells. Wells was advised to avoid creating the appearance of inappropriate conduct and keep his relationship with plaintiff focused only on professional issues.

Plaintiff's 1995 promotion also caused complaints to be submitted to the ombudsman, which Andrea Clark, in-house counsel, and Gary Collins, vice president of human resources, both from Troy, investigated. The allegation again implied that plaintiff's intimate relationship with Wells garnered her extraordinary treatment. During plaintiff's interview with Clark, she did not complain about any harassment. Finding that Wells did not have any input regarding the decision to increase plain-

tiff's pay, Clark and Brown concluded that there were no irregularities in plaintiff's promotion or pay increase.

The third ombudsman investigation arose out of plaintiff's own complaint about Wells. On January 16, 1996, Mark Turner, a facilitator who worked with plaintiff, agreed to meet plaintiff to talk after work at a nearby drugstore. After each arrived in separate vehicles, Turner got into the back seat with plaintiff in her van. Wells then arrived, opened the van door, told Turner to "keep it out of the workplace," and walked away.

The next day, Doug Judkins, safety manager, reported to Springer that Turner had claimed at work that plaintiff was the "best piece of ass" he ever had. Springer confronted Turner, who denied making the comment. Turner then told Springer about the van incident, that he believed Wells was following him, and that plaintiff had told Turner that Wells was following her, as well. Turner also said Wells had left phone messages at Turner's house and office and had, he believed, sent letters to his house and his wife's workplace. That same day, plaintiff told Springer that Wells was calling and following her, and she asked to speak with Clark (in-house counsel). Plaintiff also described the van incident with Wells and Turner. Springer assured plaintiff that he would have a conversation with Clark. Springer then called Brown, and they contacted Clark the next day. They agreed that Springer should promptly begin to gather facts and then turn the investigation over to Clark.

Springer then spoke about the complaints with Walker, who was to succeed Springer as human resources manager, and then with Wells. Wells initially denied contacting Turner outside of work since November 1995, but later related the van incident. Wells also claimed that Tur-

ner was following him and making calls to his home and office. Springer instructed Wells to cease nonessential contact with plaintiff.

After Springer's initial fact-finding, Clark again came to Asheville, reviewed Springer's notes of his investigation, spoke with plaintiff, and conducted an investigation into the *triparte* complaints. Clark instructed Wells to have no contact with plaintiff. On May 1, 1996, as a result of the investigation, Wells was terminated through reorganization

After he was terminated, Wells would return to the plant on occasions during the late spring/early summer of 1996 to handle benefits issues or to fax information to Troy. Plaintiff avers that on one of those occasions, Wells knocked on the shelf of the payroll office door and asked, "Anybody home," or "Who's there?" If she was there, she would answer Wells's questions. Plaintiff states that she mentioned to Carter that Wells was still coming to the payroll office door and asked Burgin whether Wells was supposed to be at the plant because he was not on the reorganization chart. Plaintiff never complained to Walker (head of human resources), who by then had replaced Springer. That same month, Walker informed Wells that he was no longer allowed on the plant property without an appointment, and Wells there and then turned in the keys to the company car that he had been allowed to use under his termination agreement. On that final visit, Wells went nowhere in the plant other than Walker's office, and he left the plant property on foot. Plaintiff never saw Wells at the plant after that day.

In October 1996, plaintiff called Clark for the first time since Wells left and told her that Wells had called plaintiff occasionally up until she told him that she would get a lawyer, at which point Wells stopped calling her. Plaintiff testified in relation to her EEOC charge that the offending calls stopped around September 1, 1996. During her October 1996 call to Clark, plaintiff further complained that since the investigation into sexual harassment, Carter and Burgin were treating her differently and gave the following examples of how they had done so:

(1) required plaintiff to participate in meetings regarding an interpersonal conflict with Waldrop (discussed above);

(2) required meetings regarding stolen paychecks and tightened security procedures;

(3) forgot to tell plaintiff about an unknown number of meetings; and

(4) Burgin did not speak to plaintiff unless he wanted to discuss a payroll situation.

It is undisputed that Clark, as she had in the past, attempted to investigate plaintiff's claims further, but plaintiff went on medical leave and never returned Clark's calls. Plaintiff also did not respond to Clark's letter inviting plaintiff to pursue her concerns.

On March 6, 1997, plaintiff returned from medical leave and resumed her work as payroll analyst on her regular schedule. Burgin, who was away from the plant, sent plaintiff an e-mail welcoming her back, and, thereafter, she received a favorable review.

Plaintiff states in her deposition that she was not told in advance about a plant-wide raise in 1998. Bill Smith, the new plant manager, directed Hock not to disclose the raises before the plant-wide announcement, and the payroll office staff, including plaintiff, were not told.

Plaintiff did not resign her employment until 1999. On Friday, April 16, 1999, Cindy Delk, a third-shift plant employee, came to the payroll office door and com-

plained to plaintiff that her paycheck was short. The encounter was contentious. Plaintiff complained to Delk's supervisor, who listened to the complaint and committed to initiate an investigation through Hock the following Monday when Hock returned. Burgin and Joyce Painter met with plaintiff that day. On Monday, April 19, 1999, plaintiff asked Hock about his investigation, and he said that he would meet with Delk after she got off the third-shift, which would be Tuesday morning.

Hock told plaintiff that Painter and Krug had related their information to him, and he listened to her account of the Delk encounter. She told Hock that Delk had not threatened her, and Hock gathered written accounts of the event and met with Delk. On Tuesday, April 20, 1999, plaintiff asked Hock whether he had met with Delk, and he said that he had, but that Delk's account varied from hers and that his investigation would take a week because a witness Delk identified was on vacation. Plaintiff then identified more witnesses, and Hock agreed to, and did, speak to all of the alleged witnesses. Hock also interviewed Delk's facilitator and informed him that Delk was instructed to handle all future payroll issues through him, not plaintiff. On Monday, April 26, 1999, plaintiff went to Hock's office at the end of the day. When plaintiff asked about the Delk investigation, Hock told her that one person saw Delk with her hand on her hip at the payroll office door, but there were no witnesses to corroborate the rest of plaintiff's story. Hock said he would have to note it as an argument between two employees and that he had counseled Delk to stay away from plaintiff and to handle all future payroll issues with her facilitator. Hock informed plaintiff that he could not fire someone for an unsubstantiated altercation or argument, and plaintiff responded that she would quit.

On Monday, May 3, 1999, plaintiff's resignation became effective.

## II. Administrative Background

On April 10, 1997, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and alleged that she was sexually harassed by Steve Wells and was retaliated against by having negative comments placed on her performance evaluation.

## III. Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the nonmoving party has the burden of persuasion to establish that there is a genuine issue for trial.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving [sic] party, there is no "genuine issue for trial."

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted; emphasis in the original) (quoting Fed.R.Civ.P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. *Id.* "Only disputes over

facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Id.*, at 248, 106 S.Ct. 2505. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

> [T]he court is obliged to credit the factual asseverations contained in the material before it which favor the party resisting summary judgment and to draw inferences favorable to that party if the inferences are reasonable (however improbable they may seem).

*Cole v. Cole*, 633 F.2d 1083, 1092 (4th Cir.1980). Affidavits filed in support of defendant's Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. *United States ex rel. Jones v. Rundle*, 453 F.2d 147 (3d Cir.1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. *Davis v. Zahradnick*, 600 F.2d 458 (4th Cir.1979).

## IV. Discussion

Defendant has moved for summary judgment as to each claim asserted by plaintiff in her amended complaint. Those claims are, as follows:

(1) sexual harassment
 (a) under Title VII;
 (b) under public policy of North Carolina, expressed in Chapter 143–422.2 of the North Carolina General Statutes;

(2) retaliation
 (a) under Title VII;
 (b) under public policy of North Carolina, expressed in Chapter 143–422.2 of the North Carolina General Statutes;

(3) emotional distress
 (a) under Title VII;
 (b) under public policy of North Carolina, expressed in Chapter 143–422.2 of the North Carolina General Statutes;

(4) failure to provide a safe work environment free from sexual harassment, asserted under the common law of North Carolina;

(5) intentional infliction of emotional distress, asserted under the common law of North Carolina;

(6) negligent infliction of emotional distress, asserted under the common law of North Carolina;

(7) negligent retention and supervision, under the common law of North Carolina; and

(8) constructive discharge.

While plaintiff also asserts ninth and tenth claims for relief, they are not causes of action, but *ad damnum* clauses containing statements of plaintiff's alleged monetary loss and the damages she claims. The viability of each substantive cause of action will be discussed *seriatim.*

### A. Jurisdiction

This matter arises under Title VII of the Civil Rights Act of 1964, as amended—42, United States Code, Sections 2000e, *et seq.* Plaintiff claims that she was sexually harassed by a supervisor and was constructively discharged from her employment with defendant. She timely filed a charge of discrimination with the EEOC. This court has jurisdiction over plaintiff's claims. 28 U.S.C. § 1343; 42 U.S.C. § 2000e–5(f)(3).

■ In addition to claims made pursuant to the laws of the United States, plaintiff has made claims governed by the laws of the State of North Carolina for wrongful discharge in violation of public policy; negligent and intentional infliction of emo-

tional distress; and negligent retention and supervision. This court's jurisdiction over those pendant claims is properly laid pursuant to statutory supplemental jurisdiction, which provides that a federal court's original jurisdiction extends to non-federal claims when the federal question is substantial and the claims asserted could be brought in one proceeding. In *United Mine Workers v. Gibbs*, 383 U.S. 715, 727, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court found, as follows:

> [If] considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in the federal courts to hear the whole.

Inasmuch as it appears that plaintiff's state-law claims arise from the same transactions or occurrences upon which her federal claims are based, the issues are properly joined in this action.

## B. Claim 1(a): Title VII Sexual Harassment

### 1. Introduction

 Title VII has created two recognized causes of action—*quid-pro-quo* harassment and hostile work environment. The respective burdens in the two types of sexual-harassment claims may be met with direct evidence, introduction of statements, or circumstantial evidence which is relevant and probative. *Moore v. City of Charlotte*, 754 F.2d 1100 (4th Cir.), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). As discussed *supra*, plaintiff's burden is to show that there are genuine issues of material fact warranting trial.

### 2. *Quid–Pro–Quo* Harassment

 *Quid-pro-quo* harassment is not alleged herein and, therefore, will be discussed only briefly. It is defined as "harassment in which a supervisor demands sexual consideration in exchange for job benefits," *Katz v. Dole*, 709 F.2d 251, 254 (4th Cir.1983), *see also Spencer v. General Electric Co.*, 894 F.2d 651, 658 (4th Cir.1990); and consists of conditioning employment benefits upon the employee's submitting to the sexual advances or threatening adverse employment actions if the employee does not submit, *see Tomkins v. Public Serv. Elec. & Gas Co.*, 568 F.2d 1044 (3d Cir.1977). No evidence has been presented that any job benefit or detriment (other than working in just such an environment) was conditioned upon submission to such demands. "Benefits" may include the taking of adverse employment action against an employee who refuses to submit to the supervisor's sexual advances. *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554 (11th Cir.1987).

### 3. Hostile Work Environment

 In order to maintain a claim of hostile work environment, it is required that four specific elements be shown:

(1) that the conduct was unwelcome;

(2) that the harassment was based upon sex;

(3) that the harassment was sufficiently pervasive or severe to create an abusive working environment; and

(4) that some basis exists for imputing liability to the employer.

*Paroline v. Unisys Corp.*, 879 F.2d 100, 105 (4th Cir.1989), *vacated in part*, 1989 U.S.App. LEXIS 13074 (4th Cir.1989), *vacated* 900 F.2d 27 (4th Cir.1990). The "notice" requirement can be rebutted by the employer directly or through evidence which shows the employer took prompt remedial action. *Id.* "Title VII was not

designed to create a federal remedy for all offensive language and conduct in the workplace." *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 754 (4th Cir.), *cert. denied*, 519 U.S. 818, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996). Rather, its purpose is to protect a "reasonable person" from an environment in which abuse is sufficiently severe or pervasive as to alter the conditions of his or her employment. *Id.* at 753 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 19, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), and *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Inasmuch as this is a hostile-work-environment case, each element will be discussed below in the context of a *prima facie* case.

#### 4. Abandonment of Claim

At page 4 of defendant's reply, counsel for defendant argues that plaintiff has abandoned this claim, as demonstrated at page 12 of plaintiff's responsive brief. During oral arguments, counsel for plaintiff did not counter defendant's argument that such claim was abandoned. To the extent it has in fact been abandoned, the court will dismiss the claim summarily. In an abundance of caution, the court will briefly review the claim below under Rule 56.

#### 5. A *Prima Facie* Case

■ Plaintiff cannot show that she was the victim of unwelcome harassing conduct within the 180–day period prior to filing her claim with the EEOC. Failing the first element of a *prima facie* case, the court finds that even if such claim was not abandoned, plaintiff's first cause of action is not substantively viable.

■ As to a possible continuing-violation theory for the alleged harassing conduct of Wells, plaintiff failed to assert a continuing violation administratively and did not plead it in her complaint or amended complaint. Typically, courts favor amendment to conform to the evidence:

> Rule 15(a) of the Federal Rules of Civil Procedure provides that when a party seeks leave to amend a complaint "leave shall be freely given when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), mandates a liberal reading of the rule's direction for "free" allowance: motions to amend are to be granted in the absence of a "declared reason" "such as undue delay, bad faith or dilatory motive ..., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ..., futility of amendment, etc." In *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir.1980), we noted that under Foman a lack of prejudice would alone ordinarily warrant granting leave to amend and that mere delay absent any resulting prejudice or evidence of dilatoriness was not sufficient justification for denial.

*Ward Electronics Service, Inc. v. First Commercial Bank*, 819 F.2d 496, 497 (4th Cir.1987). In Title VII cases, however, *post hoc* pleading of a continuing violation is disfavored. *Miller v. International Tel. & Tel. Corp.*, 755 F.2d 20, 25 (2d Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985). In this case, plaintiff first argued a continuing violation after defendant's summary judgment motion had been filed and briefed, and it was apparent that her Title VII harassment claim was barred for lack of any predicate acts occurring within the statutory period. As a practical matter, to allow amendment at this point would be contrary to Title VII and sound judicial administration, inasmuch as an employer has a right to know what claims are being asserted against it, to obtain discovery on those claims, and to

challenge the sufficiency of those claims prior to trial.

 A civil action under Title VII may only encompass misconduct of which the plaintiff complained in a timely-filed charge before the EEOC. *Shehadeh v. Chesapeake & Potomac Tel. Co.,* 595 F.2d 711, 724 (D.C.Cir.1978). This rule protects defendants from having to defend against stale claims. *Delaware State College v. Ricks,* 449 U.S. 250, 256–57, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). A "continuing discriminatory employment practice" is an exception to this general rule, *Shehadeh,* at 724; and where it is shown that the complained-of discriminatory practice is continuing in nature, "the administrative complaint may be timely filed notwithstanding that the conduct impugned is comprised in part of acts lying outside the charge-filing period." *Id.* The "continuing-violation" theory holds that the time period for filing administrative complaints should run from the last occurrence of the discrimination, not from the first:

> [I]t is the ongoing program of discrimination, rather than any of its particular manifestations, that is the subject of attack.

*Shehadeh,* at 724–25. In this case, plaintiff can show no violation within the statutory period, and while there may well have been acts of harassment during her employment, there is no nexus between those acts and acts occurring within the period so as to form a "continuing" violation.

> It is only when a substantial nexus exists between a timely-filed claim and an otherwise time-barred claim that they may be viewed as constituting a single violation, part of which falls within the [180–day] limitations period.

*Roberts v. Gadsden Mem. Hosp.,* 835 F.2d 793, 799–800 (11th Cir.), *modified,* 850 F.2d 1549 (11th Cir.1988). The "critical question is whether any present violation exists," *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), to which this court must answer, "No." Claim 1(a), therefore, will be substantively dismissed.

## C. Claim 1(b): State Public Policy Sexual Harassment

### 1. Abandonment of Claim

At page 4 of defendant's reply, counsel for defendant argues that plaintiff has abandoned this claim, as demonstrated at page 12 of plaintiff's responsive brief. During oral arguments, counsel for plaintiff did not counter defendant's argument that the claim was abandoned. To the extent it has in fact been abandoned, the court will dismiss the claim summarily. In an abundance of caution, the court will briefly review such claim below under Rule 56.

### 2. Substantive Discussion

 It is beyond argument that it is the express public policy of the State of North Carolina to protect the right of all people to seek, obtain, and hold employment without discrimination. Chapter 143–422.2, N.C. Gen.Stat. Plaintiff contends that her alleged constructive discharge constitutes a violation of that public policy and that North Carolina law provides her with a private cause of action. Recently, the Court of Appeals for the Fourth Circuit, in a published decision originating in this district, held, in pertinent part, as follows:

> Neither the North Carolina Supreme Court nor the North Carolina Court of Appeals has recognized a private cause of action under the NCEEPA. Instead, most courts have applied the NCEEPA only to common law wrongful discharge claims or in connection with other specific remedies.

In *Mullis v. Mechanics & Farmers Bank*, 994 F.Supp. 680 (M.D.N.C.1997), the court held that "[a]bsent a clear indication from the courts or the legislature of North Carolina that a private right of action does exist under the NCEEPA, it would be inappropriate for a federal court to create a private right of action under the NCEEPA, and this court declines to do so." We agree. *Smith v. First Union National Bank*, 202 F.3d 234, 247 (4th Cir. January 19, 2000) (citations and footnote omitted). In conformity with that decision, the court will dismiss such claim with prejudice.

### D. Claim 2(a): Title VII Retaliation

■ A plaintiff may establish a case of retaliation for reporting sexual harassment through use of a *"McDonnell Douglas* scheme." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir.1991).

■ To make out a *prima facie* case of retaliation, plaintiff would have to show the following:

(1) she engaged in protected activity;

(2) she was subjected to an adverse employment action; and

(3) a causal relationship existed between the first two elements.

If a plaintiff can establish such a *prima facie* case, the burden would shift to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ There is no promise in Title VII that a person who steps up to the plate to report allegedly unlawful conduct will be protected from public scorn. It has been ever thus. What Title VII does protect is a complainant from retaliatory, adverse employment action by his or her employer. This would include an employer condoning or encouraging unlawful conduct directed at complainants by fellow workers; however, it would not include the normal range of otherwise lawful peer reaction, which could run the gamut from support to ridicule.

Plaintiff alleges that she was retaliated against for having complained about sexual harassment. She claims that Burgin and Carter left her out of some meetings and required her to attend others; Burgin did not speak to her except about business issues; and she was not informed before all other employees about the 1998 plant-wide raise. In addition, she administratively charged that negative comments were made in her 1997 review. A fair inference from the complaint would also be that she believes Hock's failure to back her up in the Delk episode was retaliation.

■ None of the complained-of conduct rises to the level of an adverse employment action. An adverse employment action is an "ultimate employment decision." *Raley v. Board of St. Mary's County Comm'rs*, 752 F.Supp. 1272, 1281 (D.Md.1990). An adverse action is one that materially changes a term or condition of employment, such as hiring, firing, promoting, demoting, loss of pay or status, granting of leave, or a significant change in benefits. *Cohen v. Abbot Lab.*, 1999 WL 273425 **5-6 n. 2, 1999 U.S.App. LEXIS 7987, at *10 n. 2 (4th Cir.1999). In this case, even if such events could be determined to be adverse employment actions, which they are not, defendant has tendered legitimate, nondiscriminatory business reasons justifying each action. Plaintiff's attendance at certain meetings was clearly justified by defendant's unrefuted showing that one meeting was required to resolve an interpersonal conflict plaintiff had with a female coworker in the payroll

office and that new procedures were needed to prevent theft of paychecks after an actual theft had occurred. As to the unspecified missed meetings, the undisputed evidence is that Carter and Burgin simply forgot to invite plaintiff, and there is no allegation that such oversight in any way materially impacted any condition of plaintiff's employment. Plaintiff also complains that she was not informed of a plant-wide pay increase; however, the undisputed evidence is that management decided to tell no one, including *all* employees of the payroll office, so as to maximize the positive impact on the workforce. As to the Delk incident, defendant has clearly shown that Hock promptly investigated plaintiff's complaint concerning Delk, but was unable to take the plaintiff's desired disciplinary action—termination—without corroboration of plaintiff's version of what occurred. Indeed, defendant has shown that it took legitimate steps short of termination of Delk to assuage plaintiff's concerns: namely, telling Delk to address her payroll concerns to her facilitator.

 In the context of discrimination cases, speculation and conjecture raise a mere possibility of unlawful conduct rather than the reasonable probability which is necessary to support an inference of discrimination. *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 241–42 (4th Cir.1982). Speculative assertions that a defendant's motivation was discriminatory are not enough to withstand summary judgment, *Goldberg v. B. Green and Co.,* 836 F.2d 845, 848 (4th Cir.1988); and conclusory statements will not satisfy a plaintiff's burden in responding to the motion for summary judgment. *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211 (4th Cir.1987). Unsupported allegations "do not confer talismanic immunity from Rule 56." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985). Plaintiff simply has not shown any actionable retaliatory acts by defendant, and inasmuch as defendant has shown that the acts complained of were based upon legitimate, nondiscriminatory business reasons, plaintiff has not satisfied her burden of showing pretext and/or pretext plus. The court, therefore, will grant defendant's motion for summary judgment on this claim.

**E. Claim 2(b): State Public Policy Retaliation**

Plaintiff also claims retaliation in violation of state public policy. As discussed above, in light of the recent decision in *Smith,* such claim must fail as a matter of law.

**F. Claim 3(a): Title VII Emotional Distress**

Assuming the existence of such a separate cause of action under Title VII, a claim would be derivative of a *prima facie* showing that defendant had violated the substantive protections afforded employees under Title VII. As discussed above, plaintiff cannot satisfy her burden of showing actionable harassment or retaliation under Title VII. As a matter of law, this claim, too, must fail.

**G. Claim 3(b): State Public Policy Emotional Distress**

Plaintiff also claims emotional distress in violation of state public policy. As discussed above in light of the recent decision in *Smith,* this claim must fail as a matter of law.

**H. Claim 4: Common Law Safe Work Environment**

 Under *Simmons v. North Carolina Dep't of Trans.,* 128 N.C.App. 402, 496 S.E.2d 790, 793 (1998), unless an employee's work includes an activity that is

inherently or intrinsically dangerous, an employer does not owe the employee a duty of care to provide a safe work environment. An activity is inherently or intrinsically dangerous only if it can be performed safely if certain precautions are taken, but in the ordinary course of events, injury could be caused without such protections. *Id.* The court finds that, as a matter of North Carolina law, the duties plaintiff assumed as a payroll analyst were neither inherently nor intrinsically dangerous. Summary judgment will be awarded on this claim.

### I. Claim 5: Common Law Intentional Infliction of Emotional Distress/ Claim 6: Common Law Negligent Infliction of Emotional Distress

Defendant has also moved for summary judgment on plaintiff's state-law claims of negligent and intentional infliction of emotional distress.

### 1. Intentional Infliction Claim

 The elements of the intentional tort are "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." *Hogan v. Forsyth Country Club,* 79 N.C.App. 483, 488, 340 S.E.2d 116, *disc. rev. denied,* 317 N.C. 334, 346 S.E.2d 140 (1986). "It is a question of law for the court to determine, from the materials before it, whether the conduct complained of may reasonably be found to be sufficiently outrageous as to permit recovery." *Id.,* at 490, 340 S.E.2d 116. In this case, plaintiff cannot prove her claims of harassment or retaliation; indeed, plaintiff cannot show that defendant or its predecessor in any way condoned wrongful conduct to which she was allegedly subject. Most telling are the outside investigations of the alleged affair between plaintiff and Wells,

during which investigators from outside the plant questioned plaintiff as to whether any misconduct was occurring and she repeatedly denied that it was. When plaintiff finally did complain, the offender was terminated. Counterposed to the standard of "extreme and outrageous conduct" by a corporate defendant, the policies and investigatory procedures employed by defendant in this matter appear to be exactly what Title VII and the courts have been striving for: effective mechanisms for ridding discrimination from places of employment.

 Assuming that defendant would be liable under state law for the alleged acts of Wells (despite the undisputed fact that plaintiff failed to report the alleged wrongful conduct even though afforded opportunities to do so), they are not extreme and outrageous acts prohibited by North Carolina law. The alleged acts consisted of one occasion of brief touching of plaintiff's breast while attempting a kiss; briefs hugs during 1995; love notes and letters; and following plaintiff on one occasion to a drugstore while plaintiff was accompanied by another male employee. Plaintiff has not proffered evidence of acts which "exceed all bounds of decency," *West v. King's Dep't Store, Inc.,* 321 N.C. 698, 365 S.E.2d 621, 625 (1988); or which could be " 'regarded as atrocious, and utterly intolerable in a civilized community,' " *Wagoner v. Elkin City Schools' Bd. of Educ.,* 113 N.C.App. 579, 440 S.E.2d 119, 123 (1994) (citation omitted). North Carolina courts will call to task (1) those who engage in primitive and uncivilized behavior in an attempt to impose their prurient will on others or (2) those in positions of authority and responsibility (such as corporate defendants) who allow such conduct to occur or continue. Summary judgment, therefore, must be granted on plaintiff's com-

mon-law claims for intentional infliction of emotional distress.

### 2. Negligent Infliction Claim

■ To survive summary judgment on her claim of negligent infliction of emotional distress, plaintiff must present evidence upon which a finder of fact could find in her favor on each of the following essential elements:

1. the defendant negligently engaged in conduct;

2. it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress or mental anguish; and

3. the conduct did in fact cause the plaintiff severe emotional distress.

*Pardasani v. Rack Room Shoes, Inc.*, 912 F.Supp. 187, 192 (M.D.N.C.1996). Plaintiff has shown no negligent conduct or that mental anguish was reasonably foreseeable. Here the alleged wrongful conduct of Wells is not imputable to defendant, inasmuch as defendant had in place an effective policy to prevent just such conduct, and plaintiff was aware of and given meaningful opportunities to access that policy. When she finally made defendant aware of unwelcome conduct, defendant took prompt action and terminated the offending employee's employment. Carter and Burgin's conduct can in no way be reasonably foreseeable as the basis for any emotional distress. Summary judgment, therefore, will be granted on this claim.

### J. Claim 7: Common Law Negligent Retention and Supervision

■ Negligent supervision or retention has two elements:

1. that an incompetent employee committed a tortious act resulting in injury to the plaintiff; and

2. that prior to the act, the employer knew or had reason to know of the employee's incompetency.

*Smith, supra*, at 250. Again, plaintiff claims that defendant was negligent because it knew that Wells was subjecting her to sexual harassment and that Carter and Burgin were retaliating against her. It is undisputed that prior to January 17–18, 1996, defendant did not know that Wells was allegedly sexually harassing plaintiff. Indeed, plaintiff admits that she denied any harassment when questioned by a female investigator from outside the plant, and defendant had no knowledge or reason to know of a pattern of sexual harassment by Wells. *Jackson v. Kimel*, 992 F.2d 1318, 1323–24 (4th Cir.1993). There simply is no evidence that the acts of Carter or Burgin were violative of state or federal law, failing the first element of this common-law tort. Summary judgment, therefore, will be granted on this claim.

### K. Claim 8: Common Law Constructive Discharge

Plaintiff alleges that her May 3, 1999, resignation amounts to a constructive discharge because of the alleged retaliatory acts, discussed at length above, and defendant's alleged failure to provide her a safe work environment on April 16, 1999, when Cindy Delk confronted her about a problem with her paycheck.

■ The North Carolina courts, however, do not recognize a tort of constructive discharge. *Terry v. Goodyear Tire & Rubber Co.*, 1997 U.S. Dist. LEXIS 21968, at 16 (E.D.N.C. Dec. 5.1997). Summary judgment, therefore, will be granted to defendant on this claim.

### V. Conclusion

For the reasons discussed above, the court will grant defendant's Motion for

Summary Judgment. Plaintiff's motion for enlargement of the page limitations is granted, defendant's objections thereto are denied, and plaintiff's brief is deemed in compliance with the Pretrial Order. As judgment consistent with this Memorandum of Decision is filed simultaneously herewith.