DAKA, INC., Appellant,

v.

Tyrone McCRAE, Appellee.

No. 00–CV–1270, 01–CV–227.

District of Columbia Court of Appeals.

Argued Oct. 21, 2003.

Decided Dec. 24, 2003.

Theodore J. Boutrous, Jr., Los Angeles, CA, with whom Thomas H. Dupree and Jonathan K. Tycko, Washington, DC, were on the brief, for appellant.

Mara Verheyden–Hilliard, with whom Carl Messineo, Washington, DC, was on the brief, for appellee.

Before STEADMAN, FARRELL, and GLICKMAN, Associate Judges.

FARRELL, Associate Judge:

■ Daka, Inc. (hereinafter Daka) appeals from a jury award to McCrae of $187,500 in compensatory damages, $4,812,500 in punitive damages, and $276,493.28 in attorneys' fees and costs, based upon findings that Daka had negligently supervised one of its managerial employees and had unlawfully retaliated against the plaintiff for his claims of sexual harassment by that employee. Although we find no basis on which to reverse the award of compensatory damages, we conclude that the award of punitive damages must be vacated in light of *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), and the case remanded for determination of a proper award in light of that decision.[1]

## I.

Daka is a corporation that provided catering and food services for Howard University. In 1996, Daka hired McCrae as the Banquet Chef in the catering department at the University. His immediate supervisor was Cordell Thomas, a Daka manager and the catering director. In 1997, McCrae brought suit against Daka and Howard University alleging numerous causes of action, chief of which—as relevant here—were that the defendants (1) had created a sexually hostile work environment by permitting Thomas to subject McCrae "to pervasive conditions of sexual harassment"; (2) had negligently supervised Thomas in the performance of his managerial duties; and (3) had retaliated against McCrae, in violation of D.C.Code § 1–2525 (1981) (now D.C.Code § 2–1402.61 (2001)), first by effectively demoting him and then by firing him after he complained of sexual harassment by Thomas. The allegations against Howard University were eventually dismissed, and at the conclusion of McCrae's case at trial, the court dismissed the hostile work environment claim on statute of limitations grounds, concluding that McCrae had failed as a matter of law to prove a discriminatory act by Thomas within the year preceding the filing of the complaint, as required by D.C.Code § 1–2556.[2] Accordingly, the case was submitted to the jury on the claims only of common law negligent supervision and statutory retaliation.

Regarding those claims, McCrae presented evidence which, when viewed in the light most favorable to the judgment, permitted the jury to find the following facts. As Banquet Chef McCrae was an hourly employee regularly working 65–70 hours a week.[3] In that job, which required crea-

1. Daka admits that its challenge to the award of attorneys' fees depends entirely on the success of its attack upon the damage awards. Because we sustain the award of compensatory damages—in particular, because we sustain the jury's finding of liability for statutory retaliation—and reject Daka's argument that *no* award of punitive damages was proper, we uphold the trial court's statutory award of attorneys' fees. *See* D.C.Code § 2–1403.13(a)(1)(E), –1403.16(b) (2001); *Henderson v. District of Columbia,* 493 A.2d 982, 999 (D.C.1985).

2. McCrae has not cross-appealed from the dismissal on limitations grounds. Although he asserts in footnote 40 of his brief that the dismissal was "improper," that assertion is insufficient to bring the correctness of the dismissal before us.

3. The sparse evidence supporting the number of hours he worked resulted from Daka's destruction of relevant payroll records and time sheets, a destruction the trial judge found willful and caused her repeatedly to instruct

tivity in preparing meals, he supervised a staff of 20–30 employees. An array of witnesses, including McCrae, testified that Thomas would talk openly and repeatedly during work about his private sexual activities, hire male employees on the basis of their sexual attractiveness, and attempt to condition continued work by employees on their compliance with his sexual demands.

Specifically, McCrae, Clara Legett (an employee supervised by McCrae), and Charles Randall (a general utility worker), testified that Thomas would boast loudly and graphically in the kitchen about his sexual exploits the night before. Randall also testified that Thomas had hired him by mistaking him for another applicant (Robert Floyd) whose looks Thomas admired physically, after which Thomas created a new position for Floyd and made sexual advances to him. According to Floyd, Thomas told him that if he came to work, looked good, and stayed close to Thomas, he would not have to do any work. Thomas's overtures to Floyd were so regular and notorious that fellow employees called Floyd "Cordell's girl." A witness for Daka, Kathy Washington, admitted that Thomas would hire men if he thought they were cute, and would give them fewer duties than other employees.

McCrae testified that early in May 1996, Thomas asked him out for dinner and drinks, and that when he declined the offer Thomas began harassing him while claiming that Howard University management would protect him from any claims of sexual harassment. Thomas told McCrae that he was hired for the way he looked in pants, causing McCrae eventually to order chef's pants two sizes larger. On one occasion when Thomas saw McCrae yawning, he told him to "be careful where you open your mouth[, because y]ou might find something in it." Thomas would also ap-proach McCrae from behind and massage his arms and shoulders until McCrae jerked away; McCrae asked Legett to change work stations with him so he could avoid this contact. At least once, Thomas rearranged things in the refrigerator and told McCrae to retrieve things from the bottom shelf, then moaned as McCrae bent down, saying "I would like to have some of that." Floyd testified to similar unwanted touching by Thomas.

At a mid-May catering function, McCrae complained to Thomas that one of the cooks was undependable. Thomas responded by smacking McCrae in the face and telling him that the cook was going to stay because he was Thomas's "baby." When the argument continued later that night, Thomas told McCrae he was fired. The next day, McCrae told Victoria Cruickshank, who was Thomas's supervisor and a Daka General Manager, about the incident. She at first denied knowing Thomas had fired him and told McCrae to go back and talk to Thomas about it. After he did so and Thomas "rehired" him, McCrae again talked to Cruickshank, who now admitted awareness of what had happened. Legett testified that Cruickshank was present "several times" when Thomas would brag about his sexual exploits: Cruickshank, Roberta McLeod (a Howard University supervisory employee), and others "would sit in [Thomas's] office and . . . talk and laugh about Mr. Thomas's sexual activities . . . the night before." Legett also heard Thomas say that since Cruickshank and McLeod were his friends, they would not let anything happen to him. McLeod later stated, in front of Cruickshank, that she "wasn't stupid" and knew about the sexual harassment by Thomas, which had been going on for years.

the jury that it could draw an adverse infer-ence against Daka from the loss of evidence.

McCrae further testified that in this same May 1996 period, he noticed that his work hours were dropping. Legett observed the decrease and heard McCrae complain about it. When McCrae protested to Thomas, he replied that there was nothing McCrae could do about it because he (Thomas) was management, and Cruickshank and McLeod would not let anything happen to him.

McCrae tried to meet with Cruickshank to complain of the harassment, but she would not set up a meeting. On August 15, 2000, he was called to a meeting with McLeod and Cruickshank for unrelated reasons; near the end of the meeting, he told both supervisors that Thomas had been sexually harassing him, which prompted McLeod to say—as mentioned earlier—that she knew it had been going on for years and was surprised that no one had complained earlier. Following this meeting, McCrae made his allegations of harassment in writing. Cruickshank and McLeod began investigating them, but, according to Charles Randall, they asked employees whether *McCrae* had been sexually harassing anyone, rather than Thomas. To McCrae's question "why [he] was being investigated instead of Mr. Thomas," Cruickshank replied that she "had the authority to investigate whomever she [chose]." McCrae testified that his hours were cut even more at the end of August, and co-workers Legett and Dorothy Cabell confirmed that he was receiving fewer work hours despite the availability of work.

On September 18, 2000, McCrae met with Kevin Lyden, a Daka vice-president, and told him of the "unwanted touching [by Thomas], the staring, the retaliation, the cuts in hours, [and] that no one was stopping it." Lyden answered partly that "this was a five million dollar account [with Howard University] and that he wasn't going to lose it." On September 20, Lyden met with four witnesses individually who variously described Thomas's actions, his preference for employees who were "cute," and his practice of conditioning work on sexual favors. Lyden also spoke to Thomas, who denied the allegations. Lyden then formally ended the investigation, writing that he was unable to substantiate "McCrae's and various other associate[d] claims of sexual harassment by ... Thomas."

Also on September 20, McCrae asked Cruickshank to be transferred to the faculty dining room. On September 24, Thomas wrote to Cruickshank that he "felt compelled to relieve McCrae of his duties at least until the fall convocation, if not permanently." McCrae was transferred to the Bethune Annex of Howard University as a cafeteria line worker in the student cafeteria. The job entailed no responsibility or managerial functions, required no creativity, and, in addition to the loss of his job title, carried with it no opportunity for overtime work. On his first day in the cafeteria, McCrae's personal workstation was broken into at the direction of Thomas (who wanted to see if any "Daka items" were there), and papers of his were taken. When McCrae wrote Cruickshank asking to be returned to the catering department ("I needed to get back to where I am the catering chef, the banquet manager, something that holds a title whe[re] I can move on ... quickly"), Cruickshank did not respond for a month and then denied the request, saying McCrae was doing a "great job" in the cafeteria.

Less than two weeks later, Cruickshank suspended McCrae after a dispute he had with his new supervisor, Arkel Roane, on November 18 over whether a car that had blocked a loading zone at Bethune Annex belonged to McCrae. In December, McCrae was formally terminated by

Cruickshank and Lyden, ostensibly because of that "gross misconduct" which, according to the termination notice, had caused Howard University to bar McCrae from work in its food service facilities. Roane, on the other hand, testified that the events of November 18 had been only a "distraction" and a "little occurrence," which he did not believe sufficient to warrant termination.

## II.

■ We begin with Daka's challenges to the jury's findings of liability for negligent supervision and retaliation. Regarding the first, Daka argues mainly that McCrae did not offer proof that Daka had notice of Thomas's proclivity to harass employees sexually *before* McCrae "suffered harm as a result of that propensity" (Br. for App. at 19)—in time, that is, for Daka to take supervisory measures to prevent the harm. *See Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C.2001) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C.1985)) (to establish negligent supervision, "it is incumbent upon a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee"). In a case such as this, where McCrae presented evidence that he was sexually harassed by Thomas continually over a several-month period, McCrae did not have to prove Daka's knowledge of Thomas's abusive habits before the acts directed to McCrae began in May 1996. There was, in our view, sufficient evidence for the jury to find that Daka had knowledge, actual or constructive, of Thomas's habits well be-

fore his actions toward McCrae ended in August.[4] Thomas's supervisor, Cruickshank, a Daka general manager, was present with McLeod of Howard University when Thomas repeatedly bragged of his private sexual exploits. More tellingly, multiple witnesses testified that Thomas boasted openly and *notoriously* of his preference for male employees who were cute, and to his habit of favoring those among them who "stayed close to him." Cruickshank could be inferred to have known what McLeod (her Howard University counterpart) knew, which was that Thomas's sexual harassment of employees was longstanding. And, as to McCrae, she could be inferred to have known that when Thomas fired him in May (then reinstated him), the action reflected pique at a complaint that one of his "bab[ies]," another cook, was being favored over those employees who resisted his advances. Altogether, the jury could reasonably find that when Thomas told others, including McCrae, that his ties with management— specifically Cruickshank and McLeod— would shield him from any claim of sexual harassment, he spoke accurately about Daka's knowledge of Thomas's ongoing abusive behavior. That same evidence permitted the conclusion that Daka, at the least, was negligent in not taking action to prevent the conduct.

■ We further reject Daka's argument that McCrae failed to prove legally sufficient evidence of retaliation. To prove this statutory violation, *see* D.C.Code § 2–1402.61 (2001), McCrae had to establish that "(1) [he] was engaged in a protected activity, or that [he] opposed practices made unlawful by the DCHRA [District of Columbia Human Rights Act]; (2) [Daka] took an adverse personnel action against

---

4. That conclusion would be incorrect only if "no reasonable person, viewing the evidence in the light most favorable to [McCrae], could reach a verdict in favor of" a finding of timely notice. *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 363 (D.C.1993).

[him]; and (3) a causal connection existed between the two." *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C.1994). "[T]he onus is on the employee to clearly voice [his] opposition to receive the protections provided by the Act"; general complaints about "workplace favoritism" or other conduct not actionable under the DCHRA do not put the employer on the required notice. *Id.* at 48. We agree with Daka that McCrae did not voice a complaint or opposition satisfying this test until August 15, 2000, following his meeting with Cruickshank and McLeod.[5] Nevertheless, the evidence was sufficient to allow the jury to find that Daka retaliated by the twin adverse actions of transferring him in a manner effectively constituting a demotion, and then terminating him.

■ Daka argues that since McCrae himself requested the transfer to another department (regardless of why), his transfer to the Bethune Annex was not an adverse personnel action. But the jury reasonably could find that the transfer McCrae requested was not the one he received, which was to a job as cafeteria line worker entailing no responsibility and supervision of other workers, a loss of pay potential in the form of overtime, and a diminution of job title that adversely affected his employability. A transfer of that sort—effectively a demotion—was an adverse action within the meaning of the statute, even if McCrae's regular hours and hourly wage rate were not reduced. *See, e.g., Davis v. City of Sioux City*, 115 F.3d 1365, 1369 (8th Cir.1997); *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d

132, 136 (7th Cir.1993); *see also Burlington Indus. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (reassignment with significantly different responsibilities may be "[a] tangible employment action" under Title VII). Moreover, since the transfer was proximate to McCrae's written complaint of August 15, and Thomas wrote contemporaneously of his intent "to relieve Mr. McCrae of his duties [temporarily], if not permanently," the jury could readily find that retaliation was a factor substantially contributing to it. *See Arthur Young & Co., supra* note 4, 631 A.2d at 369–70.

■ The same analysis supports a jury finding that McCrae's termination was retaliatory. Daka did not call as witnesses either Cruickshank or Lyden, the two managers who made the discharge decision, and the trial judge gave a missing witness instruction—not challenged here—allowing the jury to infer that their testimony would not have favored Daka. Moreover, despite Daka's professed reason for the firing, supervisor Roane regarded the altercation leading to the discharge as a minor event that had not caused him to recommend termination. Against the background of Thomas's stated intent possibly to fire McCrae, and of Cruickshank's apparent indulgence of Thomas's abusive conduct, the jury could reasonably find that the stated reason for the termination masked, at least partly, a desire to be rid of an employee who had "come forth" (in McLeod's words) to rock the boat of Daka's relationship with Howard University.[6]

---

5. Whether actions by an employee constitute protected activity or opposition to unlawful practices within the meaning of the DCHRA is a question of law. *See Carter–Obayuwana v. Howard Univ.*, 764 A.2d 779, 790 (D.C. 2001).

6. Indeed, as vice-president Lyden told McCrae, he was not about to lose the $5 million account. The jury could fairly find there had been at best an indifferent, and at worst a sham, investigation of McCrae's complaints by Lyden further supporting the inference that McCrae had become an unwanted employee partly because of the complaints.

Daka next argues that McCrae presented no legally sufficient evidence of compensable injury for either claim submitted to the jury. Daka points out—and McCrae does not dispute—that the damages awarded by the jury were nearly all for emotional distress.[7] It then argues, first, that McCrae could not recover emotional distress damages because he offered no proof that Daka's negligent supervision placed him in a "zone of physical danger," or exposed him to imminent risk of physical harm. For this Daka cites *Williams v. Baker*, 572 A.2d 1062, 1067 (D.C.1990) (en banc) (defining the proof required to recover damages for negligent infliction of emotional distress), and language in *Sowell v. Hyatt Corp.*, 623 A.2d 1221 (D.C.1993), treating *Williams* as having "made a general statement about the requirements for recovery for emotional harm . . . caused by a defendant's negligence." *Id.* at 1224.[8]

■ We reject this argument for the reason alone that Daka has not preserved it. In moving for a directed verdict at the close of McCrae's case, Daka made no mention of this challenge to his proof. And, assuming (with considerable generosity) that it moved at all for a directed verdict at the close of the evidence, it again did not hint there of a failure by McCrae to establish a "zone of danger" connection between his injuries and Daka's negligence. "[T]he failure to include a

particular ground in a motion for directed verdict will bar the consideration of this ground [both] in a subsequent motion for judgment notwithstanding the verdict" and on appeal. *Howard Univ. v. Best*, 547 A.2d 144, 147 (D.C.1988) (*Best* II); *see also Molovinsky v. Fair Employment Council*, 683 A.2d 142, 147–48 (D.C.1996). Daka has not convinced us that any injustice would result from our failure to consider the issue for the first time now. *See Miller v. Avirom*, 127 U.S.App.D.C. 367, 370–71, 384 F.2d 319, 322 (1967). This court has not had occasion to apply the zone of physical danger test to the tort of negligent supervision,[9] and certainly not where the conduct found to have been unsupervised was not negligence but intentional wrongdoing such as sexual discrimination. Resolution of that issue should await a case in which it has been preserved.

■ Daka argues, further, that McCrae proved no causal connection between his emotional distress and the retaliation found by the jury. To the contrary, McCrae presented evidence that he suffered humiliation, anxiety, and at least some physical symptoms which the jury could fairly find were caused by his transfer/demotion and the events leading to his wrongful termination. He felt "worthless" and doubly victimized when, in response to his complaints, Daka managers first made

---

7. McCrae acknowledged in the trial court that his case "involved non-pecuniary damages," arguing—in response to Daka's post-trial motions—that the compensatory award was "well-supported . . . based upon multiple witnesses testifying to the distress and emotional injury that Mr. McCrae suffered." Although McCrae testified that his hours had been cut at times by Thomas (and the jury was allowed to draw an adverse inference from Daka's destruction of his payroll records), McCrae made no significant effort to quantify any lost wages he suffered.

8. *See also Washington v. John T. Rhines Co.*, 646 A.2d 345, 348 n. 5 (D.C.1994) (citing *Sowell* for the proposition that "[t]his court has . . . followed *Williams* in cases alleging only negligence rather than the separate tort of negligent infliction of emotional distress").

9. In *Ryczek v. Guest Servs., Inc.*, 877 F.Supp. 754, 764 (D.D.C.1995), the District Court, citing this court's decisions, applied the test to the plaintiff's claim for intentional infliction of emotional distress, but did not mention it in relation to the separate claim of negligent supervision.

him the focus of the investigation and then exonerated Thomas. His treatment by Thomas and Daka's seeming indifference to it caused him to "just start[ ] to lose it" one day in the kitchen, until he could not breathe and paramedics had to be called. His sister testified that in the months after his demotion he became depressed and inactive; he stopped spending time with family and friends; and he became unkempt and disorganized. McCrae testified that he had trouble eating and sleeping and even thoughts of killing Thomas and of suicide. Daka's argument that this did not rise to the level of "competent evidence concerning [his] injury," quoting *Carey v. Piphus*, 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), is not supported by our decisions.

For example, in *United Mine Workers of Am. v. Moore*, 717 A.2d 332 (D.C.1998), the court upheld an award of $129,000 for emotional distress based on a discriminatory firing under the DCHRA. The plaintiff, a female associate editor who had been discharged for no valid reason and replaced by a male editor, testified that "because of her deep devotion and commitment to her career," her "abrupt firing ... was a traumatic event." Her husband confirmed that, as a result of the termination, she had "a weakened physical appearance" and was "upset and shocked ... bewildered [and] devastated"; she was "lost because she was an independent person who had taken care of herself." *Id.* at 340 (internal quotation marks omitted). We found this evidence of "the impact of [the plaintiff's] termination ... on her emotional well-being" adequate to sustain the trial court's refusal to set aside the verdict. *Id.* at 341. Similarly, in *Daka, Inc. v. Breiner*, 711 A.2d 86 (D.C.1998), in upholding compensatory damages for discrimination where the plaintiff testified that aged-based slurs and innuendos had made him feel "inadequate and inept" and his wife confirmed he had suffered mentally and physically from the humiliation, we concluded:

> [t]he derogatory comments to which Breiner was subjected on a regular basis ... constitute the stuff of which a claim for humiliation and emotional harm is composed.... We are satisfied that ... the award reasonably reflected injuries which [Breiner] actually suffered despite their intangibility.

*Id.* at 100 (citation and internal quotation marks omitted). Certainly, as Daka argues, courts must be on guard against "fictitious and trivial claims" for recovery for emotional distress (Reply Br. for App. at 3, quoting *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir.1996)). But the sexual harassment by an unsupervised Thomas and the retaliation by Daka that McCrae experienced are "the stuff of which a claim for humiliation and emotional harm is composed," and, as in *Moore* and *Breiner*, the jury could properly find that McCrae suffered actual and not speculative injury.[10]

### III.

Daka makes a single argument for a new trial, contending that the trial judge erred in failing to instruct the jury on the elements of an unlawful hostile environment claim under the DCHRA as a predicate for finding Daka liable for negligent

---

10. To the extent Daka argues, not that the judge should have directed a verdict on compensatory damages, but that she should have granted its motion to remit the damages to a lesser amount, we review such decisions only for abuse of discretion, *see Safeway Stores, Inc. v. Buckmon*, 652 A.2d 597, 606 (D.C. 1994) (citations omitted), and find no such abuse here.

supervision of Thomas.[11] The instruction was necessary, Daka argues, even though McCrae's hostile environment claim had been dismissed on statute of limitations grounds. Although the trial judge told the jury—in defining negligent supervision— that a reasonable employer supervising its employees must do so "more carefully" as a "risk" of which it knows or should know "increases," she said nothing specifically about unlawful discrimination as the conduct (or "risk") that Daka allegedly had failed to prevent by its negligence. Daka cites considerable authority for the principle that negligent supervision, while an independent tort directed to the conduct of the employer, requires logically antecedent proof of a tort committed by the supervised employee.[12]

 Daka is most probably right in this argument, except that it failed to preserve it in a manner enabling us to say that the judge erred in failing to accept it. At the close of the evidence the judge and the parties discussed jury instructions. Regarding negligent supervision, Daka's attorney made a single argument to the judge, namely that this count was "duplicative" of the sexual harassment claim so that, with the latter count out of the case,

McCrae could not "come in the back door" and "call the harassment something else, *i.e.*, negligent supervision." Whatever the reason why, counsel argued, McCrae's sexual harassment claim had "failed[,] ... [a]nd where [it] failed, so to[o] must his duplicative ... claim [have] failed," [13] otherwise the court would be "in the position of instructing the jury not to consider the sexual harassment, then having to charge [it] as to what sexual harassment is." The judge's simple answer "no" elicited no further comment from Daka's counsel.

As mentioned, the judge then instructed the jury on negligent supervision without referring to the alleged sexual harassment. When finished, she asked whether either party had something to say "other than renewing objections," and Daka's counsel replied: "[A]gain, I'd object to the charge on negligence insofar as it relieves the plaintiff of the burden of showing severe and pervasive under the sexual harassment [*sic*] and permits an award just on damages." Daka now argues that this objection satisfied the requirement of Super. Ct. Civ. R. 51 that a party object to "the failure to give an instruction ... before the jury retires to consider its verdict, stating *distinctly* the matter objected to

**11.** A plaintiff "has a viable hostile environment claim if he can demonstrate (1) that he is a member of a protected class, (2) that he has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment." *Daka,* 711 A.2d at 92.

**12.** *See, e.g., Grego v. Meijer, Inc.,* 187 F.Supp.2d 689, 694 (W.D.Ky.2001) ("[t]he tort of negligent supervision is a second tort that derives from a tort committed by the person negligently supervised"); *Schulze v. Meritor Auto.,* 163 F.Supp.2d 599, 616 (W.D.N.C.2000) (summary judgment granted on negligent supervision claim where "[t]here simply [was] no evidence that the

acts of [the employees] were violative of state or federal law"); *Schoff v. Combined Ins. Co. of Am.,* 604 N.W.2d 43, 53 (Iowa 1999) ("an employer cannot be held liable for negligent supervision ... where the conduct that proper supervision ... would have avoided is not actionable against the employee"); *see also Rogala v. District of Columbia,* 333 U.S.App. D.C. 145, 157 n. 9, 161 F.3d 44, 56 n. 9 (1998) ("In order to prevail on a negligent retention claim, plaintiffs must first prove that [the employee] was negligent and must then prove the additional element of negligent retention.").

**13.** Daka has abandoned on appeal this argument that dismissal of the hostile environment claim required dismissal of the negligent supervision claim as well.

and the grounds of the objection" (emphasis added). We do not agree. While the objection referenced a basic element of a hostile work place environment claim, see note 11, *supra*, it was not clearly distinct from Daka's earlier objection to *any* instruction on negligent supervision once sexual harassment had been removed from the case. *See Ceco Corp. v. Coleman*, 441 A.2d 940, 947 (D.C.1982) (Rule 51 requires an objection to be "called to the attention of the trial court in such manner as to clearly advise it as to the question of law involved"). An objection to *any* instruction on negligent supervision and disagreement with the *form* of the instruction given are very different "question[s] of law," and in a context where Daka had neither proposed a written instruction on the tort embodying the elements of sexual harassment nor argued orally for one when the instructions were discussed, it would be inconsistent with the rule's concern for "fairness to the court and the parties," *Miller*, 127 U.S.App. D.C. at 370, 384 F.2d at 322, to say that Daka clearly voiced a request for incorporation when it objected.

■ In any case, the most Daka can arguably claim that it preserved is a request for the jury to be told it must decide whether Thomas's harassment was "severe or pervasive enough to" create a work environment abusive to employees, *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), rather than one marred by "merely offensive" behavior, *id.* at 21, 114 S.Ct. 367, or "a few isolated instances ... and genuinely trivial occurrences." *Howard Univ. v. Best*, 484 A.2d 958, 980 (D.C.1984) (*Best* I). On the record we have summarized, it is quite inconceivable that a jury would have put Thomas's abusive behavior in the latter category. Having credited McCrae's claims of retaliation by managers who— evidence showed—were willing to close

their eyes to the abuses, *this* jury obviously found those depredations severe enough to alter the conditions of McCrae's employment. In short, a retrial with instructions explicitly asking for an assessment of Thomas's conduct would be a pointless act.

## IV.

We turn, then, to Daka's challenges to the award of punitive damages. It first argues that McCrae sought punitive damages partly on the basis of Daka's wealth, yet failed to establish the company's net worth as required by our decisions in such a case; and that he also failed to prove that Daka's conduct was characterized by malice. For both reasons, Daka contends that McCrae was entitled to no punitive damages at all. Second, it argues that the award of $4,812,500 in punitive damages was constitutionally excessive in light of Supreme Court decisions, chiefly *State Farm Mut. Auto. Ins. Co., supra*. We reject the arguments in favor of no punitive damages, but are persuaded by the constitutional argument.

## A.

■ Daka concedes that evidence of a corporate defendant's net worth is not always a prerequisite to an award of punitive damages. *See Jemison v. National Baptist Convention*, 720 A.2d 275, 284 (D.C.1998); *Town Ctr. Mgmt. Corp. v. Chavez*, 373 A.2d 238, 246 (D.C.1977). Although proof of a defendant's ability to pay must be shown sufficiently to prevent an award of punitive damages "so great as to exceed the boundaries of punishment and lead to bankruptcy," *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 941 (D.C. 1995), our decisions have reserved the requirement that a plaintiff "firmly establish[ ]" the defendant's net worth—*i.e.*, the amount by which its assets exceed its liabilities at the time of trial—to cases specif-

ically where "a plaintiff invokes the defendant's wealth," *id.* at 941 n. 19, 942; and even then "net worth is only one of several considerations relevant to a punitive damages consideration." [14] Whether McCrae "invoked" Daka's wealth as a basis for the punitive award is the issue on which the parties disagree. Daka argues that when McCrae placed in evidence two of the company's financial statements—one showing assets and liabilities for 1999, the other, less clearly, similar numbers for the years 1996 through 1998—he unmistakably raised Daka's wealth as an issue, but in a manner unexplained by expert testimony concerning net worth and the meaning of the numbers. *See Chatman v. Lawlor,* 831 A.2d 395, 403 (D.C.2003) ("Under the circumstances of this case, the [plaintiffs] at a minimum should have called appellant's accountant to testify [as to net worth], with accompanying documentary evidence, unless of course [the defendant] was willing to stipulate to an amount."). McCrae, on the other hand, contends that he "did not seek punitive damages based upon [Daka's] wealth," but rather upon the magnitude of its conduct evincing malice; the financial statements were introduced only "as . . . limit[ing evidence], to provide guidance [for the jury] to make a rational decision [and] avoid an improperly large award" (Br. for Appellee at 45).

Whether a defendant's wealth has been put in issue sufficiently to require proof of net worth as the gauge of ability to pay is a murky inquiry, one likely to produce disagreement of the kind shown here. In *Jonathan Woodner Co.,* the answer was easy because from the very start the plaintiffs told the jury that the defendant was worth "in excess of a hundred million dollars" and that the "primary factor" for it to consider would be evidence of "the assets of" the company; further, "the jury was clearly instructed [by the court] to focus upon the net worth of the defendants," although—as we ultimately determined—the proof of that measure was inadequate. *Id.* at 941. *See also Chatman,* 831 A.2d at 402–03 (proof of net worth required because plaintiffs' counsel had asked that defendant whether she hadn't "amassed a fairly large sum of money at this time" and whether her husband's estate "was[n't] in excess of ten million dollars when he passed [away]"). McCrae asserts, by contrast, that his closing argument never mentioned Daka's financial statements and focused all but entirely on the array of conduct by Daka demonstrating malice or reckless indifference on its part.

We will assume with Daka that McCrae invoked the company's wealth within the meaning of *Jonathan Woodner Co.,* and will assume further (albeit generously) that the financial statements, without more, did not meet the standard established by that decision for proving net worth. Even so, we conclude that Daka is not entitled to judgment as a matter of law

---

**14.** "[T]o sustain an award of punitive damages, the plaintiff must prove, by a preponderance of the evidence, that the defendant committed a tortious act, and by clear and convincing evidence that the act was accompanied by conduct and a state of mind evincing malice or its equivalent." *Jonathan Woodner Co.,* 665 A.2d at 938. The notion that net worth is indeed the proper measure of a corporation's ability to pay punitive damages has recently been criticized. *See Mathias v. Accor Econ. Lodging, Inc.,* 347 F.3d 672,

677–78 (7th Cir.2003) (Posner, J.) (" '[N]et worth' is not the correct measure of a corporation's resources. It is an accounting artifact that reflects the allocation of ownership between equity and debt claimants. A firm financed largely by equity investors has a large 'net worth' (= the value of the equity claims), while the identical firm financed largely by debt may have only a small net worth because accountants treat debt as a liability.").

on punitive damages, which is the sole relief it requests for the inadequate proof. As in *Jonathan Woodner Co.* and *Chatman,* McCrae presented evidence through the financial statements that Daka "had *some* ability to pay," *Chatman,* 831 A.2d at 403 (emphasis added); *Jonathan Woodner Co.,* 665 A.2d at 940 ("barely sufficient evidence" permitted some award of punitive damages "based upon the defendants' ability to pay").[15] Although in each of those cases the proof of net worth was inadequate to sustain the sum of punitive damages awarded, the relief we ordered in each was a retrial of punitive damages, *id.,* or (in *Chatman,* which was a nonjury trial) a remand "for a *de novo* determination of [the defendant's] net worth." 831 A.2d at 404. But Daka, as we pointed out, has not requested a new trial on punitive damages, asserting instead—in both its opening and reply briefs—that it is "entitled to judgment as a matter of law on plaintiff's punitive damage claim," a contention we reject. We will not make the lesser argument for it. We are especially unwilling to require the expenditure of further resources that a new trial would require given our holding in part IV.B., *infra,* on Daka's constitutional claim, which will result in a sizable downward redetermination of the punitive damages award.

■ It remains for us, in this part, to reject Daka's argument that McCrae failed as a matter of law to prove malice or its equivalent. See note 14, *supra.* The trial judge, who was considerably better positioned than are we to assess the gravity of Daka's wrongdoing, wrote in a post-trial order:

> The evidence was overwhelming that Daka flagrantly ignored plaintiff's pleas for help in the work place; [and] that the wrongdoing inflicted upon the plaintiff was severe and was exacerbated by the defendant's failure to conduct even a rudimentary investigation into the allegations of harassment. As such, the jury could reasonably conclude that the company's conduct was as outrageous as that of the principal actor, · Cordell Thomas.... The sham investigation by the company and the jury determination that plaintiff's termination was retaliatory was sufficient to support the jury's conclusion that defendant's conduct was malicious and motivated by ill will.

Even if we were not as convinced as the trial judge that Daka and its predatory manager were *in pari delicto,* the evidence of malice or reckless indifference on Daka's part was fully sufficient to sustain an award of punitive damages. *See, e.g., Blackmon v. Pinkerton Sec. & Investigative Servs.,* 182 F.3d 629, 635–37 (8th Cir. 1999) ("malice or reckless indifference" to plaintiff's rights found where corporation conducted "inadequate" and "half-hearted" investigation into plaintiff's complaints; retaliated against plaintiff by reprimanding, demoting and terminating her; and attempted to escape legal liability by soliciting information against plaintiff to prove that she caused the harassment); *Baty v. Willamette, Industries, Inc.,* 172 F.3d 1232, 1244–45 (10th Cir.1999) (punitive damages affirmed on finding of sufficient evidence of "malice or reckless indifference," where management conducted sham investigation and condoned harassment); *Jackson v. City of Albuquerque,* 890 F.2d 225, 229 (10th Cir.1989) (punitive damages

---

15. Daka's 1990 financial statement, for example, stated an amount for "total assets" that equaled the company's "total liability and equity" for the year, listing the "shareholders['] equity" as a figure substantially in the mil-

lions of dollars. Daka does not dispute the authenticity of the numbers in either of the statements, only their sufficiency to establish its net worth without further explanation.

supported by evidence where defendant conducted a "sham investigation" and solicited witnesses against plaintiff); *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 861 (7th Cir.2001) (abuse of discretion to disallow punitive damages under Title VII where there is evidence of a "sham" investigation to discredit plaintiff and protect management).[16]

## B.

■ Daka contends that the punitive damages awarded were "grossly excessive" and therefore deprived it of constitutional due process, especially in light of *State Farm Mut. Ins. Co. v. Campbell, supra* (hereafter "*State Farm*"), which was decided after the trial of this case.[17] On this issue, Daka is correct. Although the facts established by the jury's verdict justified a significant award of punitive damages, the sum awarded—reflecting a ratio of 26:1 to the compensatory damages award—lacked the reasonableness and proportionality required of a punitive damages award.

## 1.

■ In *State Farm*, the Court reaffirmed its prior teaching that, "[w]hile States enjoy considerable discretion in deducing when punitive damages are warranted," due process "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor," *State Farm*, 123 S.Ct. at 1520, and specifically requires any such award "to comport with the principles set forth in [*BMW of North Am.,*

*Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)]." *Id.* at 1525. To decide whether an award is constitutional, a reviewing court must apply "three guideposts":

(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Id.* at 1520 (citing *Gore*, 517 U.S. at 575, 116 S.Ct. 1589). Further, appellate courts must "conduct *de novo* review of a trial court's application of [the guideposts] to the jury award." *Id.* at 1520. "Exacting appellate review ensures that an award of punitive damages is based upon an application of law, rather than a decisionmaker's caprice." *Id.* at 1520–21 (citation and internal quotation marks omitted).

The Court granted certiorari in *State Farm* to decide whether an award of $145 million in punitive damages was constitutionally "excessive," where the jury had awarded $1 million in compensatory damages "for a year and a half of emotional distress" stemming from State Farm's refusal to provide insurance coverage for an automobile accident in which the plaintiff-policyholders had been involved. *Id.* at 1516, 1524. After applying each of the *Gore* guideposts, the Court concluded that, while an award of punitive damages "at or

---

**16.** Daka makes no argument that punitive damages may not be based on acts or omissions underlying a tort—such as negligent supervision—requiring proof only of negligence; nor did it ask for an instruction to this effect or for a bifurcation of punitive damages as to the separate torts of retaliation and negligent supervision. We therefore do not consider this issue other than as discussed in note 24, *infra.*

**17.** Daka also makes no argument of excessiveness that might be based on District of Columbia common law. *See Daka, Inc. v. Breiner*, 711 A.2d at 104 (Steadman, J., concurring in part and dissenting in part); *Bowden v. Caldor, Inc.*, 350 Md. 4, 710 A.2d 267, 277–78 (1998).

near the amount of compensatory damages" likely would have been justified, "[t]he punitive award of $145 million ... was neither reasonable nor proportionate to the wrong committed" and thus "was an irrational and arbitrary deprivation of [State Farm's] property." *Id.* at 1526.

The phrase "reasonable and proportionate" (or a close variant of it) appears four times in the Court's opinion, and McCrae and Daka differ in assessing the relevance of *State Farm* to this case partly by which of these adjectives they think predominates in the Court's analysis. McCrae stresses the Court's discussion of reprehensibility—"[t]he most important indicium of the *reasonableness* of a punitive damage award," *id.* at 1521 (quoting *Gore*, 517 U.S. at 575, 116 S.Ct. 1589) (emphasis added)—and sees the decision primarily as rejecting, as *un*reasonable, the plaintiffs' use of "[the] case ... as a platform to expose, and punish, ... State Farm's operations throughout the country" rather than its conduct toward the plaintiffs "that harmed [them]." *Id.* at 1521, 1523. "Due process," the Court explained, "does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of reprehensibility analysis." *Id.* at 1523. McCrae is correct that this concern with improper use of "out-of-state conduct" and more broadly conduct "that [bears] no relation to the [plaintiffs'] harm" as a basis for punitive damages, *id.* at 1522, 1523, has little relevance to the case before us. Nevertheless, as Daka counters, to focus only or inordinately on that part of the opinion ignores critical instruction the Court gave regarding the other *Gore* factors, principally the

disparity between compensatory damages and a punitive damages award.

As it had been in the past, the Court was unwilling "to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *Id.* at 1524. It explained, however, that "[o]ur jurisprudence and the principles it has now established demonstrate ... that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* The Court cited its earlier conclusion in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), "that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety," and its reference to "that 4–to–1 ratio again in *Gore*," as well as its allusion there to "a long legislative history ... providing for sanctions of double, treble, or quadruple damages to deter and punish." *Id.* The Court found it "obvious" that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards" such as, "in this case, of 145 to 1." *Id.*

Furthermore, it explained, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.*[18] It noted that "[t]he compensatory award in this case was substantial; the Campbells were awarded $1 million for a year and a half of emotional distress." *Id.* Moreover, the harm did not arise "from some physical assault or trauma; there were no phys-

---

**18.** Conversely, "ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" 123 S.Ct. at 1524 (quoting *Gore,* 517 U.S. at 582, 116 S.Ct. 1589).

ical injuries," and "the Campbells suffered only minor economic injuries." *Id.* at 1525. Lastly,

> The compensatory damages for the injury suffered here ... likely were based on a component which was duplicated in the punitive award. Much of the distress was caused by the outrage and humiliation the Campbells suffered at the actions of their insurer; and it is a major role of punitive damages to condemn such conduct. Compensatory damages, however, already contain this punitive element. *See* RESTATEMENT (SECOND) OF TORTS § 908, Comment c, p. 466 (1977) ("In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both").

*Id.* The Court mentioned this last factor again in holding that "[a]n application of the *Gore* guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages," but could not justify as either reasonable or proportionate the award of $145 million. *Id.* at 1526.

### 2.

This case, of course, does not present the staggering ratio of 145:1 that made *State Farm* "neither close nor difficult" on

whether the punitive damages award satisfied due process. *Id.* at 1521. Moreover, Daka makes no serious claim that the conduct on which the award was based incorporated "other parties' hypothetical claims against a defendant under the guise of reprehensibility analysis." *Id.* at 1523.[19] And factors the Supreme Court cited as indicia of reprehensibility speak in favor of a significant punitive damages award here: Daka's conduct, the jury reasonably could find, "evinced an indifference to or a reckless disregard of the health"—at least the psychological health—of McCrae and other Daka employees; and the conduct, including successive acts of retaliation, "involved repeated actions" rather than "an isolated incident." *Id.* at 1521. But the size of the award nevertheless is excessive under *State Farm*'s teaching. The 26:1 ratio here exceeds a "single-digit" ratio "significant[ly]"; and it is far beyond both the 4:1 ratio the Court had said in *Gore* "might be close to the line of constitutional impropriety" and the traditional statutory double, treble, or quadruple damages which the Court found "instructive" as a measure in *State Farm. Id.* at 1524. Moreover, McCrae was awarded "substantial" compensatory damages for approximately six months of emotional distress[20]—an award, we note, almost nineteen times greater than the compensatory damages awarded for similar emotional injury in *Daka, Inc. v. Breiner, supra.* Further, McCrae proved at best "minor economic injuries" (without quantifying them) in the form of overtime lost as a result of his transfer to the cafeteria, and his injuries were essentially emotional, not arising from "physical

---

19. Although Daka cites McCrae's *post hoc* reliance on this court's decision upholding the judgment against Daka in *Daka v. Breiner, supra,* as well as a consent judgment against Daka for discrimination in a case in the United States District Court, the jury in this case did not learn of those judgments.

20. The emotional distress might have continued meaningfully beyond McCrae's termination if the firing caused him a loss of employment or reduced earnings in a new job, but McCrae presented no evidence of either.

assault or trauma." Finally, as in *State Farm*, "[m]uch of [McCrae's] distress was caused by the outrage and humiliation [he] suffered at the actions of [Thomas and Daka]," conduct which the compensatory award already partly "condemn[ed]." *Id.* at 1524–25.

Applying the third *Gore* factor—the difference between the punitive damages award and civil penalties authorized or imposed in comparable cases—reinforces the conclusion that the award here was excessive. In *State Farm*, the Court found that "[t]he most relevant civil sanction under Utah state law for the wrong done to the Campbells appears to be a $10,000 fine for an act of fraud," [21] an amount "dwarfed by the $145 million punitive damages award." *Id.* at 1526. In our case, the most relevant civil penalty appears to be the gradation of monetary penalties permitted by the DCHRA (over and above compensatory damages), most pertinently D.C.Code § 2–1403.13(a)(1)(E–1)(iii), which allows the Human Rights Commission upon finding that a respondent "has been adjudged to have committed 2 or more unlawful discriminatory practices" during a 7-year period to impose a penalty of $50,000. We do not suggest, any more than did the Supreme Court, that a penalty such as this approaches the limit of what a civil jury could award in punitive damages, but the fact remains that it bears no relationship to the $4 million award here. In the comparable case of *Daka v. Breiner*, the award

of punitive damages we sustained for similar workplace discrimination resulting in similar emotional distress was $390,000. *See* 711 A.2d at 88. Although McCrae argues that the chief relevance of that decision is that the same defendant—Daka—had not learned its lesson, even accepting that proposition,[22] the disparity between that award and the present one remains enormous.[23]

For these reasons, we will vacate the award of punitive damages and remand the case to the trial court with directions to reduce the award of punitive damages to a sum consistent with the principles expressed by *State Farm* and in this opinion. Although that determination (should either party challenge it) will again be subject to the "[e]xacting appellate review" *State Farm* requires of any punitive damages award, we choose not to forgo the advantages of having the trial judge, who had "the opportunity to observe the trial as it unfold[ed]," *Davis v. United States*, 564 A.2d 31, 41 (D.C.1989) (en banc), make the determination in the first instance. *See Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 896 (D.C.2003) (en banc) (remanding for reconsideration by the trial judge of the reasonableness of a combined punitive damage award of $535 thousand where several bases for liability had been removed from the case). In light of the principles discussed, however, we wish to make plain that an award in this case that multiplies the sum awarded for compensa-

---

**21.** The Campbells had sued State Farm for bad faith, fraud, and intentional infliction of emotional distress. *State Farm*, 123 S.Ct. at 1518.

**22.** Our decision sustaining the verdict in that case (though not the verdict itself) was rendered after the conduct of Daka at issue in this case.

**23.** Of course, as the Supreme Court pointed out in *State Farm*, see note 18, *supra*, a large

ratio of punitive to compensatory damages may be acceptable where the plaintiff's injury was slight but the defendant's conduct particularly egregious. *See, e.g., Mathias v. Accor Econ. Lodging, Inc., supra* note 14, 347 F.3d at 677, 678 (under *State Farm*, punitive damages award of $186,000 on top of compensatory damages of $5,000 was justified where defendant's conduct was outrageous but plaintiff's harm was difficult to quantity).

tory damages by more than a factor of five will bear a very heavy burden of justification.[24]

Unlike in the usual case where a remittitur is ordered, it will be unnecessary here for the trial judge to give McCrae the option of accepting the remitted amount or a new trial on punitive damages.[25] That is because the amount to be determined by the judge is the constitutional maximum which the jury could properly award, an amount that its actual award has already exceeded. *See Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331–32 (11th Cir.1999); *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1049 (8th Cir. 2002). McCrae, in a word, does not need the option of a new trial at which to receive a lesser sum of punitive damages than he has already received.

## V.

The judgment of the Superior Court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

24. Beyond the factors already discussed, the trial judge should consider the fact that McCrae has been awarded substantial statutory attorneys' fees. See note 1, *supra*. In applying due process analysis under *State Farm*, one court has pointed to an award of attorneys' fees in a sexual discrimination case as "includ[ing] a certain punitive element" and to that extent as favoring a lesser rather than greater award of punitive damages. *Parrish v. Sollecito*, 280 F.Supp.2d 145, 164 (S.D.N.Y.2003).

Relevant also is that Daka's liability for *any* damages was based partly on a finding of negligence (*i.e.*, negligent supervision), a degree of culpability ordinarily insufficient to support punitive damages at all. Of course,

in assessing punitive damages here the jury may have viewed Daka's fault as going well beyond simple negligence, see note 14, *supra*; but still, the element of *un*intentional wrongdoing inherent in one of the twin bases for the defendant's liability is a fact to be taken into account.

25. Notwithstanding the partial relationship between the compensatory damages—reflecting emotional distress—and punitive damages discussed earlier, *see State Farm*, 123 S.Ct. at 1524, the two were not inextricably intertwined here such that a reduction in the amount of punitive damages requires retrial of the compensatory damages at McCrae's election.