**HOWARD UNIVERSITY, Appellant/Cross–Appellee,**

v.

**Shirelette WILKINS, Appellee/Cross–Appellant.**

**Nos. 09–CV–318, 09–CV–319, 09–CV–544.**

District of Columbia Court of Appeals.

Argued Sept. 9, 2010.
Decided June 30, 2011.

Musa L. Eubanks, for appellant/cross-appellee.

Michael J. Hoare, with whom Dennis Chong, Washington, DC, was on the brief, for appellee/cross-appellant.

Before FISHER, Associate Judge, REID,[*] Associate Judge, Retired, and BELSON, Senior Judge.

REID, Associate Judge:

These cross-appeals pertain to claims for retaliation and defamation filed by Shirelette Wilkins, appellee/cross-appellant, against her employer, Howard University ("Howard"), appellant/cross-appellee. A jury rendered a verdict in favor of Ms. Wilkins on her retaliation claim, awarding her $1.00 in compensatory damages. In addition, the jury awarded her $42,677.50 in punitive damages after "find[ing] by clear and convincing evidence that [Howard's] actions in terminating [her] were undertaken recklessly, maliciously, wantonly, and/or in reckless disregard to Ms. Wilkins' rights under the District of Columbia Human Rights Act ["the DCHRA"]." Howard appeals the trial court's (the Honorable Thomas J. Motley's) denial of its post-trial renewed motion for judgment and new trial on the ground that the trial court erred by failing to reduce the jury's punitive damages award (Appeal No. 09–CV–318).

Prior to trial, the trial court (the Honorable Patricia A. Broderick) "denied with prejudice" Ms. Wilkins' defamation claim. Ms. Wilkins challenges the trial court's ruling, including its conclusion that Howard was entitled to a qualified privilege with respect to the alleged defamatory statements (Appeal No. 09–CV–319). The trial court (Judge Motley)[1] also denied Ms. Wilkins' post-trial motion for equitable relief. Ms. Wilkins contends that the court erred because she was entitled to reinstatement based on the jury's verdict on her retaliation claim (Appeal No. 09–CV–544).

We discern neither trial court error nor trial court abuse of discretion, and thus, we affirm the trial court's judgments for the reasons stated below.

## FACTUAL SUMMARY

Ms. Wilkins filed a lawsuit against Howard on January 31, 2005. She alleged two causes of action—defamation and retaliation under the DCHRA. She claimed that Howard retaliated against her by terminating her employment because of her prior sexual harassment claim. She also asserted that Howard defamed her by declaring that she "engaged in 'theft of grant funds' and/or 'serious misconduct.'" She maintained that Howard's "conduct is outrageous, malicious, wanton, reckless, and/or in willful disregard for Plaintiff's rights under law." She sought compensatory and punitive damages, as well as prejudgment interest and reasonable attorneys' fees.

Prior to trial, Howard lodged a motion for summary judgment on July 3, 2006. In response, the trial court (Judge Broderick) "denied with prejudice" Ms. Wilkins' defamation claim. Judge Broderick ruled, in part, that Howard's "statements were . . . qualifiedly privileged," and that "[q]ualified privilege is a defense to what would otherwise constitute defamation, provided that the statements were made in good faith and without malice." In addition, Judge Broderick stated:

Where authorized staff members of the Human Resources Department convened . . . to investigate the stated discrepancies in the Paper Direct invoice,

---

[*] Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on April 7, 2011.

[1] As a result of a routine transfer of caseload, Judge Motley took over this case around December 2006.

the [c]ourt finds that these authorized Hospital personnel had a common interest in knowing whether or not [Ms. Wilkins] had, in fact, billed [Howard] for supplies that were directly sent to her home. . . . The [c]ourt finds that only authorized staff members of [Howard] were privy to the information contained in the investigation and [Ms. Wilkins'] file. No parties outside of [Howard's] authorized staff were privy to the information . . . [T]he [c]ourt finds that [Howard's] statements were privileged where they were made in apparent good faith[,] [w]ithout reckless disregard as to the falsity of the publication, and in the common interest of the . . . Hospital.

However, the court allowed Ms. Wilkins' retaliation claim to proceed to trial, because of "disputed issues of material fact."

The background for Ms. Wilkins' complaint, which we now summarize, is reflected in testimony presented and documents introduced at the trial by both parties. Ms. Wilkins began her employment with Howard in 1990 when she was hired "as a secretary in the department of medicine" at Howard University Hospital ("the Hospital"). In March 2002, Ms. Wilkins fell, suffering injuries to her right hand and arm, as well as other parts of her body. She was treated by a neurosurgeon, Dr. Gary Dennis, and ordered not to work due to a 100 % disability. Dr. Dennis reported that Ms. Wilkins was unable to work from the time of her injury to June 1, 2004, because of "bilateral carpel (sic) tunnel syndrome, which require[d] further treatment and rehabilitation."

About one year before her injury, Ms. Wilkins had filed a February 2001 lawsuit against Howard, alleging a DCHRA sexual harassment violation, due to the alleged actions of her supervisor. Trial on this 2001 lawsuit began in January 2003, and eventually, the jury returned a verdict in favor of Howard.

Six months later, an employee and labor relations specialist at the Hospital, Repunzelle Johnson, sent Ms. Wilkins a letter (July 1, 2003), which stated: "According to our records, there is no documentation supporting your continued need to be out. As such, Management is requesting that you report back to work. Your failure to respond within ten (10) days or contact this office may be taken as a sign of your resignation." Ms. Johnson's letter of July 9, 2003 to Ms. Wilkins, in response to a voice mail message from her, declared that the Hospital expected Ms. Wilkins to return to work on July 15, 2003, and that if she was unable to work, she "must provide medical documentation substantiating that on or before . . . July 15, 2003." Ms. Wilkins' July 14, 2003 letter to Ms. Johnson advised her that she (Ms. Wilkins) had an appointment with Dr. Dennis on July 18, 2003, and that she would obtain an updated medical report from him at that time. She also asserted that she did not intend to resign. Later, Ms. Wilkins provided the Hospital with a disability certificate from Dr. Dennis, dated July 18, 2003, which stated that she was "100% disabled and cannot perform duties."

According to Renee Joy Inman–Turner, director of human resources for the Hospital, and Randall McKinney, then administrative director for Howard's department of medicine,[2] Mr. McKinney learned that on June 27, 2003, Ms. Wilkins had ordered items from Paper Direct Company for delivery to her home and the items were "paid for, or invoiced to an account—that is a grant account out of the department of medicine." The amount of the invoice was $168.83 but some of the items were re-

---

2. Mr. McKinney left Howard on October 30, 2003.

turned, leaving a balance of $88.93 due and owing.[3] Mr. McKinney called Paper Direct to make sure the invoice was correct, and contacted the chief of gastroenterology to determine whether purchase of the items had been authorized—they had not. He did not contact Ms. Wilkins about the invoice because she was on medical leave and he "just didn't feel like it was appropriate at that point."[4] However, on October 7, 2003, he recommended that Ms. Wilkins be terminated. A personnel recommendation form, dated October 6, 2003, stated: "Ms. Wilkins is being terminated due to theft of grant funds. See attached termination letter."

Although the personnel action form was prepared in October 2003, it was not sent to Ms. Wilkins at that time. Ms. Wilkins received the Personnel Recommendation Form on February 13, 2004, but the termination letter was not attached. Despite her repeated efforts from February to May 2004 to obtain a copy of the termination letter from the department of medicine or from the human resources office,[5] and Howard's promises that the letter would be sent to her, Ms. Wilkins never received a copy of the letter. Ms. Turner–Inman could not locate a copy of the termination letter.

In May 2004, Ms. Wilkins visited the University for the purpose of obtaining a copy of her termination letter.[6] Ms. Wilkins spoke by phone with Ms. Turner–Inman while she was at the University and asked why her phone calls had not been returned and why she was unable to obtain her termination recommendation letter. Ms. Wilkins claimed that Ms. Turner–Inman responded, "We don't like being sued."[7]

Ms. Wilkins did not hear from Ms. Turner–Inman in June, July, or August. However, on September 20, 2004, Ms. Turner–Inman sent a letter to Ms. Wilkins

---

3. Ms. Turner–Inman acknowledged that Howard never paid Paper Direct any money on the invoice, and never informed the campus police or the Metropolitan Police Department about the alleged theft. Nor did Howard attempt to collect any money from Ms. Wilkins to cover the amount of the invoice.

4. Howard's employee handbook specified that where charges "of serious neglect of duty or conduct incompatible with the welfare of the [u]niversity" are made against an employee, they "must be substantiated by the supervisor." The handbook states that: "Failure of the employee to refute successfully such charges constitutes grounds for dismissal." Ms. Wilkins' counsel asked her at trial: "Were you offered any opportunity to refute . . . these charges?" She replied: "No, I wasn't."

5. Ms. Wilkins "logged in" thirty-four calls that she made, but did not record some of the other calls she made.

6. Ms. Wilkins introduced a human resources intake form, dated May 25, 2004, at trial. She had written, in part:

> I have tried on numerous occasions to obtain a copy of my termination letter from your office. I have left messages with virtually everyone of your staff members, and I still cannot obtain a copy of the letter. I also offered to pick the letter up from the desk, and it is still unavailable. I've been trying since February 15, 2004.

She left the original intake form at the human resources office, gave a copy to one of the doctors at the department of medicine, and left a copy with an assistant to one of the key persons in the human resources office.

7. Ms. Turner–Inman denied making the statement. There is no record of Ms. Turner–Inman having made the statement, and no one other than Ms. Wilkins claims to have overheard the statement. The statement also did not appear in Ms. Wilkins' initial complaint, her amended complaint, or in her initial responses to Howard University's interrogatories. Ms. Wilkins' first mention of the statement was in her supplemental responses to Howard's interrogatories, which were filed with the court eleven days before the start of the trial.

informing her that she could not locate the termination letter, but she stated, in part: "[P]lease accept this letter as official notification of termination of employment with the Howard University Hospital, effective October 3, 2003. Your employment was terminated for serious misconduct." Ms. Wilkins responded to the September 20th letter on September 27, 2004. She recounted the history of her efforts to obtain a copy of the termination letter referenced in the personnel action form, and ended by declaring:

> I have not engaged in any theft of grant funds or serious misconduct. I would appreciate a written explanation for your claim for termination for theft of grant funds, as referenced in the justification sheet attached to the personnel recommendation form, and serious misconduct, as referenced in the September [2]0th letter.
>
> Please respond by Tuesday, October 5, 2004. . . .

On October 12, 2004, Ms. Turner–Inman sent Ms. Wilkins a letter which read:

> Dear Ms. Wilkins, please be advised that I am in receipt of your letter dated September 27, 2004, received on October 8, 2004.
>
> Your letter stated that I should respond to you by Friday, October 8, 2004. I telephoned you at the number indicated in your letter to inform you of such; however, I am not sure I was recorded. Sincerely, Renee Turner–Inman, director, office of human resources.

Ms. Wilkins never received the termination letter, or an investigative report, or any explanation for the allegations of theft. On November 3, 2004, Ms. Wilkins again wrote to Ms. Turner–Inman, repeated her September 2004 letter, and again asked for specific documents, as follows:

> For example, an in-depth investigation; notification of charges, and/or allegations, in writing, or in person; detailed report from the Metropolitan Police Department and campus police; the total amount you allege was stolen from the grant, as well as the name of the grant and principal investigator; dates that the funds allegedly were stolen; copies of any cancelled checks, front and back, et cetera.

She asked that the documents be sent to her "no later than Friday, November 12, 2004." Ms. Wilkins did not receive any response to her November 3, 2004 letter; nor did she receive any of the requested documents.

Ms. Wilkins eventually determined that "there was a discrepancy with regard to the vendor, Paper Direct." Around the latter part of June 2003, Ms. Wilkins had contacted Paper Direct in her capacity as co-chair of her family reunion, scheduled for the July 4th weekend, and had placed an expedited order for "covers and tassels to be used for the reunion booklet." She intended to use the tassels as bookmarks. She had opened a personal account at Paper Direct and these items were to be billed to her personal account. Ms. Wilkins used the covers but returned the tassels, and Paper Direct sent her an invoice showing a credit for the tassels. She paid no attention to the "sold to" box on the invoice that identified the purchaser, and she forwarded the invoice for her order to the cousin who was responsible for the bills associated with the reunion. Later, in December 2004, her "counselor" revealed "that there were two accounts [at Paper Direct] associated with [her] name." She paid the account listed in her name in January 2005.[8]

---

8. Howard's counsel cross-examined Ms. Wilkins extensively about the Paper Direct invoice, pointing out that the original invoice and the invoice reflecting the credit for the

Ms. Wilkins denied any wrongdoing and testified, in part, that "[t]his was a simple misunderstanding that could easily have been resolved with just one telephone call from the hospital asking [her], Ms. Wilkins, ... [to] please explain what happened here." Other people were contacted about the matter but she was not. Being called a thief was "very degrading" and "made [her] feel horrible." It was "embarrassing, humiliating," and "an awful feeling."

The jury verdict form for Ms. Wilkins' retaliation claim consisted of four questions. First, "[d]o you find by a preponderance of the evidence that [Howard] retaliated against [Ms. Wilkins] in violation of the District of Columbia Human Rights Act by terminating her?" The jury checked the "Yes" box. The second question instructed the jury to "[s]tate the amount, if any, of compensatory damages that you award to [Ms. Wilkins]." The jury awarded "$1.00." The third question asked: "Do you find by clear and convincing evidence that [Howard's] actions in terminating Ms. Wilkins were undertaken recklessly, maliciously, wantonly, and/or in reckless disregard to Ms. Wilkins' rights under the District of Columbia Human Rights Act?" Because the jury answered that question in the affirmative, the jury proceeded to the fourth question: "State the amount of punitive damages that you award to [Ms. Wilkins.]" The jury indicated "$42,677.50."

Howard filed a post-trial renewed motion for judgment, and for a new trial, or in the alternative to alter or amend judgment (remittitur) contending, in part, that "[t]he jury could not reasonably conclude

that Howard's actions were malicious and motivated by ill will," and that the size of the punitive damages award was constitutionally excessive. Judge Motley denied Howard's motion. With respect to the retaliation claim the trial court concluded that the evidence Ms. Wilkins presented at trial was sufficient to support the jury's verdict.

## ANALYSIS

### Howard's Appeal: The Punitive Damages Issue

■ Howard argues that "the jury unconstitutionally imposed grossly excessive punitive damages upon Howard University," and consequently, the court should have granted Howard's request for remittitur. Ms. Wilkins contends that "Howard's analysis is misguided and ignores important propositions of law; [and that] the jury's award of punitive damages should be upheld."

■ Whether punitive damages are "constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case, and in this context *de novo* review ... is appropriate." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 435, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (citation omitted). "The Due Process Clause[ ] of the Fifth ... Amendment[ ] prohibits [the District of Columbia] from imposing a 'grossly excessive' civil punishment upon a tortfeasor." *Modern Mgmt. Co. v. Wilson*, 997 A.2d 37, 45 (D.C.2010); *see also State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) ("*State Farm*"). *BMW of North*

returned tassels both showed that the items were shipped to her home but sold to Howard. Ms. Wilkins indicated that she did not know why her relative had not paid the bill. The relative died "sometime after the re-

union." When confronted with a December 22, 2004 letter from Paper Direct showing that the order was placed on Howard's account, Ms. Wilkins insisted that "Paper Direct placed [her] order on the wrong account."

*Am. Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), identified three "guideposts" or criteria for courts to follow in "evaluating a punitive damages award's consistency with due process." *Cooper Indus., Inc., supra,* 532 U.S. at 440, 121 S.Ct. 1678. The Court reiterated these guideposts in *State Farm:*

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual and potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Id.,* 538 U.S. at 418, 123 S.Ct. 1513 (citing *Gore,* 517 U.S. at 574–75, 116 S.Ct. 1589). Because the first guidepost may "turn[ ] on witness credibility and demeanor," trial courts "have a somewhat superior vantage over courts of appeals[.]" *Cooper Indus., Inc.,* 532 U.S. at 440, 121 S.Ct. 1678. "Trial courts and appellate courts seem equally capable of analyzing the second factor." *Id.* "And the third *Gore* criterion, which calls for a broad legal comparison, seems more suited to the expertise of appellate courts." *Id.*

Here, in addressing Howard's request for remittitur, the trial judge declared, in part:

> [T]he jury was free to credit plaintiff's theory and evidence, that defendant attempted to force plaintiff out of her position based on her prior litigation.
>
> This [c]ourt also disagrees with defendant's view that the punitive damages award is so excessive that it violates defendant's due process rights. Although it is true that "few awards exceeding a single-digit ratio between punitive and compensatory damages ... will satisfy due process," *State Farm,* 538 U.S. [at] 425 [123 S.Ct. 1513], there

are circumstances in which high-ratio awards are appropriate. Specifically, "because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those [courts] have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *Id.* In the instant case, the jury awarded plaintiff nominal economic damages. Additionally, it found the defendant's behavior to be reprehensible.

After setting forth the three *Gore* guideposts, the trial judge concluded: "The jury determined that the defendant retaliated against plaintiff for filing a complaint against it, and sought to punish defendant for its actions. Under these facts and circumstances, this [court] will not disturb the jury's punitive damages award." Like the trial judge, we see no need to disturb the jury's punitive damages award to Ms. Wilkins.

In *Modern Mgmt. Co.,* we reiterated the legal principle that "[p]unitive damages may be awarded only if it is shown by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages." 997 A.2d at 55 (citing *Chatman v. Lawlor,* 831 A.2d 395, 400 (D.C.2003) (internal quotation marks omitted)). Here, the first *Gore* guidepost, "the degree of reprehensibility of the defendant's misconduct," *State Farm,* 538 U.S. at 418, 123 S.Ct. 1513, "turn[ed] on witness credibility and demeanor," *Cooper Indus., Inc.,* 532 U.S. at 440, 121 S.Ct. 1678. Hence, the trial judge appropriately placed a correctly worded special interrogatory on the jury verdict form for the jury's consideration and response: "Do you find by clear and convincing evidence that [Howard's] actions in terminating Ms. Wilkins were undertaken

recklessly, maliciously, wantonly, and/or in reckless disregard to Ms. Wilkins' rights under the [DCHRA]?" The jury answered yes and awarded Ms. Wilkins $42,677.50. Howard does not expressly challenge the jury's affirmative response to the special interrogatory. Therefore, the first *Gore* guidepost is satisfied.

Howard complains that the trial judge did not "bother to go through an analysis of all three 'guideposts' and "should have considered the 'guideposts' collectively." While the trial court's order does not contain an explicit analysis of the second and third *Gore* guideposts, it identifies those factors and includes legal principles relating to them. Moreover, "[t]rial courts and appellate courts seem equally capable of analyzing the second factor [a]nd the third *Gore* criterion ... seems more suited to the expertise of appellate courts." *Cooper Indus., Inc., supra,* 532 U.S. at 440, 121 S.Ct. 1678. We therefore address the second and third guideposts under our *de novo* standard of review.

With respect to the second *Gore* guidepost, "the disparity between the actual and potential harm suffered by the plaintiff and the punitive damages award," Howard emphasizes the jury's punitive to compensatory damages award ratio and mainly argues that "the 'harm' to [Ms. Wilkins] was minor" as "evidenced by the fact that the jury awarded her only $1 in compensatory damages."

■ In *Modern Mgmt. Co., supra,* we recognized that, under *Gore,* "a punitive damages award should bear some reasonable relationship to the corresponding award of compensatory damages, but such a relationship is only one factor in an excessiveness analysis." *Id.* at 58 (citation and internal quotation marks omitted). Although the Supreme Court has stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages ... will satisfy due process," *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513, that Court has repeatedly declined to impose a "bright-line ratio which a punitive damages award cannot exceed." *Id.* Furthermore, courts in other jurisdictions adhere to the principle that "greater ratios may comport with due process ... when reprehensible conduct results in only a small amount of economic damages." *Saunders v. Branch Banking And Trust Co. of Virginia,* 526 F.3d 142, 154 (4th Cir.2008) (quoting *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513 (internal quotation marks omitted)).[9] Another important factor in considering the disparity between the actual harm suffered by a plaintiff and the punitive damages award is that: " '[A] punitive damages award must remain of sufficient size to achieve the twin purposes of punishment and deterrence.' " *Modern Mgmt. Co.,* 997 A.2d at 59 (quoting *Saunders,* 526 F.3d at 154).

In this case, the small compensatory damages award, combined with the District's strong interest in deterring DCHRA violations,[10] justifies a ratio higher than

---

9. *See also Abner v. Kansas City S.R.R. Co.,* 513 F.3d 154, 165 (5th Cir.2008) (upholding a punitive damages award of $125,000 for each plaintiff in a Title VII racial discrimination case where the jury awarded no compensatory damages and $1 to each plaintiff in nominal damages); *Kemp v. AT & T Co.,* 393 F.3d 1354, 1364 (11th Cir.2004) (Georgia's interest in deterring fraud and illegal gambling justified punitive damages in the amount of $1

million where plaintiff was awarded $115.05 in actual damages; a single-digit multiplier ratio "would utterly fail to" punish and deter AT & T); *Mathias v. Accor Econ. Lodging, Inc.,* 347 F.3d 672, 678 (7th Cir.2003) (upholding a punitive damages award of $186,000 to each plaintiff where only $5,000 in compensatory damages was awarded).

10. *See Howard Univ. v. Best,* 484 A.2d 958, 978 (D.C.1984) (citing *Report of the Council of*

might otherwise be acceptable.[11] *See Daka, Inc. v. Breiner,* 711 A.2d 86, 102 (D.C.1998) (stating that the need to deter future DCHRA violations warranted a punitive damages award that exceeded the maximum available under Title VII). Indeed, had the jury awarded $42,677.50 in *compensatory* damages, that amount would have seemed entirely reasonable—perhaps modest—in light of the evidence. Reducing the jury's punitive damages award to an amount "not significantly larger than nine times the actual damages awarded in this case would mean that [Howard] would receive a sanction of little more than [ten] dollars." *Kemp, supra,* 393 F.3d at 1364. That small award levied against an institution as large as Howard "would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter." *Id.* (citing *Gore,* 517 U.S. at 568, 116 S.Ct. 1589 ("Punitive damages may properly be imposed to further a State's legitimate interest in punishing unlawful conduct and deterring its repetition.")). We therefore conclude that there is no need to disturb the jury's punitive damages award under the second *Gore* guidepost.

As for the third *Gore* guidepost, we examine "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases," *State Farm,* 538 U.S. at 418, 123 S.Ct. 1513. Two of our cases are relevant to an examination of the third *Gore* guidepost, *Daka, Inc. v. McCrae,* 839 A.2d 682 (D.C.2003) and *Daka, Inc. v. Breiner, supra.* In *McCrae,* the jury awarded plaintiff $187,500 in compensatory damages and $4,812,500 in punitive damages. *Id.* at 686. We vacated the punitive damages award and remanded the case for determination of a proper award in light of the Supreme Court's decision in *State Farm Mut. Auto. Ins. Co. v. Campbell, supra.* We upheld a punitive damages award of $390,000 in *Breiner* where the jury also awarded plaintiff $10,000 in compensatory damages. 711 A.2d at 88.

In *Breiner,* we initially considered the cap of $300,000 in Title VII of the Civil Rights Act pertaining to employment discrimination cases "when the employer has more than 500 employees." *Id.* at 102 (citing 42 U.S.C. § 1981a (b)(3)(D) (1994)). Despite the Title VII cap, we affirmed the $390,000 punitive damages award even though it exceeded the cap by roughly $100,000. We explained that "because of the need to deter future misconduct of the sort presented on [the] record [in that case], we think the additional $100,000 is not so excessive as to render the jury's award unconstitutional, especially when there is no ceiling on the damages available under the 1866 and 1870 Civil Rights Acts on which the DCHRA is also based." *Id.* In *McCrae,* we focused on the obvious gross disparity between the jury's compensatory award of $187,500 and its punitive damages award of $4,812,500, and determined that, unlike *Breiner, McCrae* fell squarely under the rationale articulated in *State Farm* where "the Court found that the most relevant civil sanction under Utah state law for the wrong done to [the

---

*the District of Columbia on Pub. Servs. and Consumer Affairs,* July 5, 1977 at 3 ("Enactment of Title 34's provisions as the Human Rights Act would underscore the Council's intent that the elimination of discrimination within the District of Columbia should have the 'highest priority.' ")).

11. We also note that, contrary to Howard's assertion, Ms. Wilkins suffered more than just economic harm. She also suffered emotional harm at a time when she was physically and emotionally vulnerable, a matter that can be considered even though the jury awarding her only $1 in compensatory damages. *See Modern Mgmt. Co.,* 997 A.2d at 55.

plaintiffs] appears to be a $10,000 fine for an act of fraud, an amount dwarfed by the $145 million punitive damages award." *McCrae*, 839 A.2d at 700 (internal quotation marks and footnote omitted).

We believe that our approach in *Breiner* is more appropriate for this case. Unlike *State Farm* and *McCrae* where the trial court awarded compensatory damages in the amount of $1 million and $187,500 respectively, or even *Breiner* where plaintiff received $10,000 in compensatory damages, the jury awarded Ms. Wilkins only $1 in compensatory damages. Hence, as we saw with the second *Gore* guidepost, a greater ratio "may comport with due process." *Saunders, supra,* 526 F.3d at 154. Clearly $1 in compensatory damages and $10 in punitive damages will not deter Howard from engaging in the kind of retaliatory behavior which the jury found in this case. Given the need to deter this kind of conduct in the future, $42,677.50 "is not so excessive as to render the jury's award unconstitutional, especially when there is no ceiling on the damages available under the 1866 and 1870 Civil Rights Acts on which the DCHRA is ... based." *Breiner,* 711 A.2d at 102. Therefore, we see neither error nor abuse of discretion in the trial court's denial of Howard's request for remittitur.

### Ms. Wilkins' Appeal: The Defamation and Reinstatement Issues

■ Ms. Wilkins assigns two errors to the trial court with respect to her defamation claim. First, she argues: "[T]o the extent that the trial court 'held' that Ms. Wilkins failed to "prove" that Howard made a defamatory statement about her, it erred as a matter of law." Second, she contests the trial court's conclusion that Howard enjoyed a qualified privilege with respect to its statement about the theft of grant funds. Because we agree with the trial court's ruling on qualified privilege,

summary judgment in favor of Howard was proper.

A trial court's grant of a motion for summary judgement is reviewed *de novo. Clampitt v. American Univ.,* 957 A.2d 23, 28 (D.C.2008). "[S]ummary judgment is proper if there is no issue of material fact and the record shows that the moving party is entitled to judgment as a matter of law." *Id.* (citing Super. Ct. Civ. R. 56(c)). We view the record "in the light most favorable to the party opposing the motion." *Guilford Transp. Indus., Inc. v. Wilner,* 760 A.2d 580, 592 (D.C.2000) (citation omitted). Furthermore, "we must assess the record independently, but the substantive standard applied is the same as that utilized by the trial court." *Id.* (citation omitted).

■ To assert a defamation claim, Ms. Wilkins had to allege the following elements:

> (1) That the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Blodgett v. The University Club,* 930 A.2d 210, 222 (D.C.2007) (citation omitted). A statement is protected by the common interest privilege if it was " '(1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest.' " *Id.* at 223–24 (quoting *Moss v. Stockard,* 580 A.2d 1011, 1024 (D.C.1990)). " '[O]nce it is decided that the communication is

privileged, the burden is on the plaintiff to prove the privilege has been abused.'" *Id.* at 224 (quoting *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 290 (D.C.1977)). "The plaintiff may defeat the privilege by showing that the statement was made with 'express malice or malice in fact.'" *Id.* (quoting *Moss, supra,* 580 A.2d at 1024). Whether the common interest privilege exists is a question of law. *Id.*

To prove her defamation claim, Ms. Wilkins was required to show that Howard published the statement about theft of grant funds without privilege to a third party. *Blodgett, supra,* 930 A.2d at 222.[12] The record supports the trial court's summary judgment ruling in favor of Howard based on a qualified privilege.

Ms. Wilkins' complaint alleges that Howard "published the defamatory material well beyond those individuals necessary to implement its decision (a total of ten people were involved in calling Ms. Wilkins a thief and implementing her removal)." Yet, neither the allegations in Ms. Wilkins' complaint, nor her opposition to Howard's summary judgment motion indicates that anyone outside of Howard or outside of the personnel authorized to investigate the alleged theft were privy to the statement. Even assuming more individuals than were necessary viewed the statement, Ms. Wilkins does not allege that such individuals had "no useful business purpose" for doing so. *See Thomas v. Howard,* 168 A.2d 908, 910 (D.C.1961).

Moreover, we see no evidence of excessive publication in Ms. Wilkins' opposition to Howard's summary judgment motion. The crux of Ms. Wilkins' bad faith publication argument is that Howard failed to contact her to ascertain why she allegedly charged her personal products to a Howard account. By itself, the failure to contact Ms. Wilkins is insufficient to demonstrate express malice on Howard's part since Howard reasonably could have expected Ms. Wilkins to deny the theft of grant funds. Moreover, as we said in *Moss:*

> if a plaintiff, to satisfy the burden of proving a prima facie case, may rely on showing a failure to make a reasonable investigation as to the truth before publication of the statement, logically he should not be able to rely on the same

---

12. Contrary to Ms. Wilkins' assertion, Howard did not waive the affirmative defense of qualified privilege by failing to raise it in its answer. Super. Ct. Civ. R. 8(C) states that "[i]n responding to a pleading, a party shall set forth affirmative defenses, including ... res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense." Howard stated in its motion for summary judgment that "undisputed evidence demonstrates that the Hospital did not disclose Ms. Wilkins' personnel recommendation to a third party," and "[a]t most, only the parties who provided the requisite signatures for Ms. Wilkins' personnel recommendation form and other authorized administrative staff were privy to the contents of Ms. Wilkins' personnel recommendation form." This statement was sufficient to raise the affirmative defense of privilege under Super. Ct. Civ. R. 8(C). *See, e.g., Whitener v. Washington Metro. Transit Auth.,* 505 A.2d 457, 459 (D.C. 1986) (stating that Rule 8(C) should be construed liberally "especially when no substantial prejudice would result from permitting the defendant to raise an affirmative defense at a later stage in the litigation").

Furthermore, Ms. Wilkins did not satisfy her burden with respect to the second element of a defamation claim. We see no extrinsic evidence in or attached to Ms. Wilkins' opposition to Howard's motion for summary judgment that would establish express or actual malice on Howard's part, or that Howard's statement was "so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that [Howard] was actuated by express malice." *Moss, supra,* 580 A.2d at 1024.

proof—and no more—to defeat a qualified privilege defense.

580 A.2d at 1026. Here, the record shows that Howard reasonably communicated its theft statement only to its employees who had some responsibility for grant funds or supervision of Ms. Wilkins. Hence, it was entitled to the common interest privilege and that privilege defeated Ms. Wilkins' defamation claim. Thus, the trial court properly granted summary judgment in favor of Howard.

We turn now to Ms. Wilkins' reinstatement claim. She contends that: "The trial court wrongly accepted Howard's representation that Ms. Wilkins was deemed to have been separated from [Howard's] employment at the time she accepted long-term disability status." She maintains that Howard is estopped from taking a different position after trial, and hence, Howard improperly reversed its pre-trial position—that it did not retaliate against Ms. Wilkins—and asserted post-trial that "ill will still lingers between Howard and Ms. Wilkins."

 While reinstatement is a preferred remedy, it "is not the exclusive remedy, because it is not always feasible, such as when there exists irreparable animosity between the parties." *Feldman v. Philadelphia Hous. Auth.,* 43 F.3d 823, 831 (3d Cir.1994) (citations and internal quotation marks omitted); *see also Palasota v. Haggar Clothing Co.,* 499 F.3d 474, 489 (5th Cir.2007). "Guided by the particular circumstances of a case, the [trial] court has broad discretion in determining whether reinstatement is appropriate, and its determination is reviewed under an abuse of discretion standard." *Feldman,* 43 F.3d at 832; *see also Webb v. District of Columbia,* 331 U.S.App. D.C. 23, 34, 146

F.3d 964, 976 (1988) ("Whether reinstatement is indeed appropriate may be determined only after careful consideration of the circumstances of a particular case" (citations omitted)). Generally, a trial court's decision to order reinstatement as a remedy will not be disturbed. *Id.*

 On this record, we are satisfied that the trial court did not abuse its discretion in determining that reinstatement was inappropriate in this case because (1) Ms. Wilkins was on long-term disability at the time Howard retaliated against her, and (2) lingering animosity between Ms. Wilkins and Howard militated against ordering reinstatement. As the trial court determined, Ms. Wilkins' long-term disability status militated against reinstatement. Reinstatement may be inappropriate where the employer can no longer guarantee the employee her previous position or where the position no longer exists. *Palasota, supra,* 499 F.3d at 489–90 (reinstatement inappropriate where comparable sales position no longer existed). Neither party disputes that Ms. Wilkins was on long-term disability at the time of her wrongful discharge, having submitted medical certification to the University stating that she was "100% permanently disabled" and unable to work because of carpal tunnel syndrome. Howard University Hospital Benefits Manager Demetrius Pontillo testified that when a Howard employee applies for and obtains long-term disability, that employee relinquishes her position, but continues to receive 60% of her pay as well as some benefits.[13] Employees are informed prior to accepting long-term disability benefits that if they become physically able to return to work, they must apply for available positions like

---

**13.** Ms. Wilkins continued to receive 60% disability payments through August 2004, despite the fact that she testified at the relief hearing

that by June 2004 her condition had improved and she was prepared to return to work.

anyone else. The trial court therefore determined that Ms. Wilkins would have had to apply for an open position at Howard after she was well enough to return to work.[14] Because Ms. Wilkins was not eligible to return to her position at the time of her retaliatory discharge, the trial court determined that reinstatement would put Ms. Wilkins in a position "above and beyond that which would make her whole." We see no reason to disturb this determination.[15]

Nor do we see any reason to disturb the trial court's determination that the antagonism between Ms. Wilkins and Howard was "of such magnitude so that it would be impossible to have a reconciliation." *Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 957 (10th Cir.1980). The jury was not asked to resolve Howard's specific accusation that Ms. Wilkins engaged in theft of grant funds.[16] As the trial court observed, that accusation is "a source of differing opinions and great hostility between the parties." Although Ms. Wilkins stated at the hearing on equitable relief that she was ready to go back to work and held no ill-will towards Howard, she testified at trial that she felt the University's accusations against her were "degrading," "total-

ly embarrassing," and had "made it very impossible for [her] to even go back and engage in any type of friendship [she] had there." Given these circumstances, we conclude that the trial court did not abuse its discretion in deciding not to order Ms. Wilkins' reinstatement because it was doubtful that the parties would be able to maintain a "productive and amicable working relationship" in the future. *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1370 (7th Cir.1992) (declining to award reinstatement in an action brought under Title VII) (quotations and citation omitted).

Accordingly, for the foregoing reasons, we affirm the judgments of the trial court.

*So ordered.*

---

**14.** Following the jury's retaliation finding, Ms. Wilkins did not request back pay. The trial court noted that "[i]t is unusual for a plaintiff who was wrongfully terminated not to make a claim for back pay, yet to request equitable relief of reinstatement."

**15.** We reject Ms. Wilkins' contention that Howard should be judicially estopped from asserting that reinstatement is inappropriate. Judicial estoppel applies "when a litigant switches positions from one proceeding to another," *Ivey v. District of Columbia*, 949 A.2d 607, 611 (D.C.2008), but here, Howard's current position is "not inherently contradictory" to its position at trial. *Id.* Ms. Wilkins points to conditional language in Howard's July 2003 letters—"*if* Ms. Wilkins failed to appear for work or to provide medical document, *then* she would be terminated from

employment." However, as the trial court explained, the relevant point in time is the point at which Ms. Wilkins' wrongful termination became effective, which is October 2003. At that time, Ms. Wilkins had already relinquished her position as a consequence of accepting long-term disability.

**16.** The trial court noted that "although the jury decided that the retaliation against plaintiff for bringing a prior sexual harassment suit was a substantial factor in plaintiff's termination, the jury did not resolve the issue of whether or not plaintiff had attempted to steal grant funds." The trial court did not issue a mixed motive jury instruction in this case. As a result, the jurors were not asked to decide whether Ms. Wilkins' termination was due solely to retaliation and not her alleged misconduct.